**Robert J. GILMORE**

v.

**UNITED STATES of America.**

**Civ. No. K–75–754.**

United States District Court, D. Maryland.

Sept. 26, 1977.

---

Allen L. Schwait, Paula M. Junghans and Garbis & Schwait, P. A., Baltimore, Md., for plaintiff.

F. Gerald Burnett, U. S. Dept. of Justice, Washington, D. C., and Gerard P. Martin, Asst. U. S. Atty., Baltimore, Md., for defendant.

FRANK A. KAUFMAN, District Judge.

Plaintiff instituted this tax refund case, seeking to recover $418.38 paid in partial satisfaction of assessments for federal taxes relating to income withholding, social security and unemployment. Defendant, in turn, by counterclaim, seeks to recover $119,-588.95 of such taxes plus interest and penalties. All of the taxes relate to the calendar years 1967, 1968 and 1969. Trial has been held and memoranda and oral argument have been presented as to (a) whether any such taxes are due and owing by plaintiff for those years, and if so, (b) whether or not penalties as well as taxes and interest should be assessed.[1]

I

The crux of this case is whether plaintiff's solicitors were employees or independent contractors. The Federal Insurance

---

1. Such taking of evidence and presentation of argument has related, to date, only to issues of liability, vel non, and not to the amounts, if any, of taxes, interest and penalties. Factual and legal questions relating to such amounts have been separated, by agreement of Court and counsel for both sides, for later trial if necessary.

Contributions Act, 26 U.S.C. §§ 3101–3126, provides in part with regard to old-age, survivors and disability insurance (section 3101(a)) that a certain tax is "imposed on the income of every individual * * * received by him with respect to employment (as defined in section 3121(b))"; and with regard to hospital insurance (section 3101(b)) that a certain tax is "imposed on the income of every individual * * * received by him with respect to employment (as defined in section 3121(b)), * * ." Section 3102(a) states that "[t]he tax imposed by section 3101 shall be collected by the employer of the taxpayer, by deducting the amount of the tax from the wages as and when paid." Section 3111(a) provides that as to old age, survivors and disability insurance, "there is hereby imposed on every employer an excise tax, with respect to having individuals in his employ, equal to the following percentages of the wages (as defined in section 3121(a)) paid by him with respect to employment (as defined in section 3121(b))." Section 3111(b) states that as to hospital insurance, "there is hereby imposed on every employer an excise tax, with respect to having individuals in his employ, equal to the following percentages of the wages (as defined in section 3121(a)) paid by him with respect to employment (as defined in section 3121(b)), * * *." Section 3121 provides in part:

*Definitions*

(a) *Wages.*—For purposes of this chapter, the term "wages" means all remuneration for employment, including the cash value of all remuneration paid in any medium other than cash * * *.

(b) *Employment.*—For purposes of this chapter, the term "employment" means any service, of whatever nature, performed * * * either (A) by an employee for the person employing him * * *.

* * * * * *

(d) *Employee.*—For purposes of this chapter, the term "employee" means—

* * * * * *

(2) any individual who, under the usual common law rules applicable in de-

termining the employer-employee relationship, has the status of an employee; or * * *.

The Federal Unemployment Tax Act, 26 U.S.C. §§ 3301–3311, provides in part that "[t]here is hereby imposed on every employer (as defined in section 3306(a)) * * * an excise tax, with respect to having individuals in his employ, equal to 3.1 percent of the total wages (as defined in section 3306(b)) paid by him during the calendar year with respect to employment (as defined in section 3306(c)) * * *." Section 3306, prior to amendment on August 10, 1970, provided in part:

*Definitions*

* * * * * *

(b) *Wages.*—For purposes of this chapter, the term "wages" means all remuneration for employment, including the cash value of all remuneration paid in any medium other than cash * * *.

(c) *Employment.*—For purposes of this chapter, the term "employment" means * * * any service, of whatever nature, performed * * * by an employee for the person employing him * * *.

* * * * * *

(i) *Employee.*—For purposes of this chapter, the term "employee" includes an officer of a corporation, but such term does not include—

(1) any individual who, under the usual common law rules applicable in determining the employer-employee relationship, has the status of an independent contractor, or

(2) any individual (except an officer of a corporation) who is not an employee under such common law rules.

As a result of the 1970 amendment, section 3306(i) adopts the language of section 3121(d) set forth above.

26 U.S.C. 3401 provides in part, with respect to collection of income tax at source on wages:

*Definitions*

(a) *Wages.*—For purposes of this chapter, the term "wages" means all remuner-

ation (other than fees paid to a public official) for services performed by an employee for his employer, including the cash value of all remuneration paid in any medium other than cash * * *.

_ * * * * * *

(c) *Employee.*—For purposes of this chapter, the term "employee" includes an officer, employee, or elected official of the United States, a State,[2] or any political subdivision thereof, or the District of Columbia, or any agency or instrumentality of any one or more of the foregoing. The term "employee" also includes an officer of a corporation.

Section 3402(a) provides with regard to income tax collected at source that "[e]very employer making payment of wages shall deduct and withhold upon such wages * * a tax determined in accordance with tables prescribed by the Secretary."[3]

■ Each of those statutes relating to federal withholding, social security and unemployment taxes defines "employee" in substantially identical terms and all are based upon the common law. *Avis Rent A Car System, Inc. v. United States*, 503 F.2d 423, 428 n.2 (2d Cir. 1974).[4] Many factors enter into that common law definition including "degrees of control, opportunities for profit or loss, investment in facilities, permanency of relation and skill required * * *." *United States v. Silk*, 331 U.S. 704, 716, 67 S.Ct. 1463, 1469, 91 L.Ed. 1757 (1947). In the same year as *Silk* was decided, Mr. Justice Reed, in *Bartels v. Birmingham*, 332 U.S. 126, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947), after discussing specific factors, observed (at 130, 67 S.Ct. at 1550): "It is the total situation that controls." In *Avis*, Judge Hays (at 429) culled from *Silk* and *Bartels*[5] the following seven factors:

1) If the person receiving the benefit of a service has the right to control the manner in which the service is performed, the person rendering the service may be an employee.

2) If a person rendering a service has a substantial investment in his own tools or equipment, he may be an independent contractor.

3) If a person performing a service undertakes a substantial cost, say by employing and paying his own laborers, he may be an independent contractor.

4) If a person performing a service has an opportunity to profit depending on his management skill, he may be an independent contractor.

5) If a service rendered requires a special skill, the person rendering it may be an independent contractor.

6) If the relationship between a person rendering a service and the person receiving it is permanent, it may be an employment relationship.

7) If a person rendering a service works in the course of the recipient's business, rather than in some ancillary capacity, he may be an employee. [Footnote omitted.]

*And see Filipidis v. United States*, 27 A.F.T. R.2d 71–595 (D.Md.1970) (Harvey, J.).

In this case, plaintiff, Robert J. Gilmore, conducted a magazine subscription sales operation under an arrangement with Local Readers Service, a company based in Terre Haute, Indiana, which represented various magazines and publishers. The magazines sold in plaintiff's operations included only those publications which Local Readers Service was authorized to accept. Local Readers Service agreed to pay to plaintiff as the latter's commission 80% of the sales price of

---

**2.** Prior to amendment on October 4, 1976, the word "Territory" appeared after the word "State."

**3.** Prior to amendment on October 4, 1976, section 3402 included the tables necessary for computing the withholding taxes. Those tables now appear in 26 C.F.R. ¶ 31.3402.

**4.** 26 C.F.R. ¶ 31.3121(d)—1(c). That latter regulation is set forth in full in *Avis, supra* at 426

n.1. *See also* 26 C.F.R. ¶ 31.3306(i)—1, *discussed in Avis, supra* at 427.

**5.** *Avis* dealt with the same three types of taxes involved herein. *Silk* and *Bartels* were concerned only with social security taxes. Judge Hays noted (at 428 n.2) that "the same standard controls the meaning of 'employee' " with regard to all three types of taxes.

the magazine to the purchaser. Out of those commissions plaintiff paid his expenses including commissions to the individual solicitors engaged by him. Those solicitors did the actual selling of the magazines, primarily on a door-to-door basis. The commission of each solicitor was generally 25% of the sales price of the magazine to the purchaser.

Plaintiff's solicitors were usually recruited through newspaper advertisements. One such advertisement, captioned "Boys—Free Travel," stated in part: "Major cities USA as reps of Ebony, Jet, Tan & others. (Girls also.) No exp nec, we train you in circulation." Another, titled "Girls—Free Travel," read in part: "Large chaperoned group has openings for neat, single people." Each solicitor signed a written contract with both plaintiff and Local Readers Service. Both contracts stated specifically that the nature of the relationship was that of independent contractor.

During the years in question, the total number of solicitors working varied from 20 to 60. Most of them traveled with plaintiff and one or more of his lieutenants from city to city in automobiles provided by certain of them or by plaintiff. In any event, plaintiff paid for the costs of inter-city auto transportation. Most of the solicitors stayed as a group in each city at a hotel chosen and resided in by plaintiff and his lieutenants. The cities were chosen by plaintiff or by his lieutenants at his direction. Plaintiff advanced for his solicitors their room and food costs, deducting such advances from commissions earned. There was no formal training program; rather, training was acquired by having new solicitors observe more experienced solicitors in operation and by conversations among old and new solicitors. Given the nature of the job, more extensive training was not deemed necessary. Plaintiff, in his testimony in this case, has emphasized the unstructured aspects of those and other working relationships and arrangements, and has minimized elements of control on his part. Plaintiff has stressed that a solicitor's income was only from commissions and accordingly depended upon his own individual efforts and skill. Gilmore testified that no authority was exercised by him or by his agents in determining either the areas to be covered within the cities visited, or the hours to be worked on any given day. Plaintiff has also pointed out that each solicitor could, if he desired, choose his own living quarters and that, although morning meetings were scheduled each working day in the hotel in each city at which plaintiff and most solicitors stayed, the agendas of those meetings were not instructional or organizational in nature, and attendance at them was not compulsory.

The totality of the evidence does not, however, support the conclusions urged by plaintiff as to lack of control in fact. While there may have been a theoretical right on the part of each solicitor not to conform to the normal routine followed by the great majority of solicitors, in a practical sense, plaintiff exercised extensive control over the solicitors. More than 90% of them traveled as a group. Some persons, particularly married couples, did not live with the group in the same hotel. However, most of the solicitors lived together. Contact in the hotel and during non-soliciting hours with experienced solicitors was part of the training of new solicitors. Living together was convenient both for the solicitors and for plaintiff. Plaintiff would tip the hotel staff to compensate for the extra burden of caring for the group. This expense, unlike the basic room charge, was not passed on to each solicitor. Some solicitors were "terminated" for inappropriate behaviour in the hotel or with other members of the group. Despite certain views to the contrary expressed by plaintiff, the record establishes that the morning meetings in the hotel were in fact organizational in purpose. While attendance may not have been mandatory, attendance of the average solicitor was expected, and required of those solicitors who failed to meet minimum standards. In sum, the community type of living was in fact imposed upon, expected of, and adopted by most solicitors.

At least 90% traveled each working day from the hotel to the areas in which they

would work in cars provided by plaintiff and driven by drivers selected by and working for him. Those drivers suggested, if indeed they did not designate, the streets and areas in which each solicitor sold door-to-door. The drivers also determined the times of departures from and returns to the hotels and the determination of the meeting places within the area being sales-covered. Thus, the drivers effectively established working hours for all who rode the shifts with them. Most solicitors regularly rode those shifts. Some solicitors worked on their own. Most of those who so did were successful enough to survive. Those who were not so successful, however, and who were unable to earn the $30 per day necessary to cover their bed and board expenses were told to rejoin the group and work from a car. If a solicitor who worked from a car was not able to earn at least $30 a day, the amount necessary to cover his expenses, he was, at least after a trial period, terminated. Usually, when termination of a solicitor occurred plaintiff in the end bore the loss for any money advanced to the solicitor and not covered by commissions earned.

There was in practical effect control by plaintiff over items sold by his solicitors. It is true that there was apparently no formal prohibition against selling magazines other than those distributed by Local Readers Service. However, in practice, such selling did not occur. There was testimony that several persons traveled with the group, but sold for different companies and that one person did not sell at all for Local Readers Service. This was permitted as an accommodation to her manager in return for receipt by plaintiff of a small override commission on that lady's sales and because she was particularly helpful to new solicitors. But that isolated practice had little or no bearing upon the general practice in fact followed by plaintiff's solicitors, *i. e.*, they sold what he gave them to sell.

The work assigned to the solicitors did not require them to work in unison with others. Nor did anyone maintain strict supervision or control over all aspects or all movements of each solicitor's performance. Plaintiff simply cared about results and, as is sometimes the case in life, satisfactory results were achieved by the nonconformist. As long as a solicitor was successful and nondisruptive in behaviour, plaintiff was satisfied and did nothing to curtail a successful solicitor. Plaintiff, however, in any event retained in fact the right to control where, when, and, to some extent, how his solicitors worked.[6] Most of plaintiff's solicitors in fact performed best in the highly structured environment over which plaintiff through himself and others exercised a high degree of control. While individual deviation was permitted or tolerated from time to time, in general plaintiff dealt with the solicitors as a group. As related *supra*, the solicitors lived together and worked as members of a group. Also, as related *supra*, plaintiff believed that such group experienced best trained new solicitors and best provided continuous benefits, in terms of shared experiences, for even his more senior solicitors. In short and in sum, plaintiff shaped and structured the group's living and working arrangements directly or through his own lieutenants.

The facts in this case establish the following with regard to each of the seven factors listed by Judge Hays in *Avis*:

1. The right to control existed. That factor is one, but "not the foremost factor" "to be considered in distinguishing employees from independent contractors." *Avis, supra* at 428, relying upon *Silk, supra*, 331 U.S. at 714–15, 67 S.Ct. at 1469.

2 and 3. The solicitor did not make a substantial investment or undertake a substantial cost.

4 and 5. Skill in selling, as well as effort, was a factor, but neither management nor special skills were required unless either

---

**6.** Certain job performances, in connection with which an employer retains the right to control, require little or no need to exercise that right. However, it is the latter, *i. e.*, the right to

control, which is important. *See McGuire v. United States*, 349 F.2d 644 (9th Cir. 1965). That case in turn cites and relies upon two earlier Fourth Circuit cases.

natural and/or acquired ability to sell is a special skill. In this case, in which so many factors establish the employment relationship, it is not necessary to decide whether or not such skill is "special" as that word is used in *Avis*, though this Court would think that it is not "special."

6. The relationship was indefinite in nature, though not of a type which can be described as close to permanent. About 80% of Gilmore's solicitors lasted less than a month. Nevertheless, the relationships in this case can hardly be described as merely "transient" in nature. But, in any event, the existence of a transient relationship is only one of the factors to be weighed. In *Avis, supra* at 429, the Second Circuit held that "[t]he district court erred in relying solely on facts tending to show the transient nature of the Avis-car shuttler relationship, overlooking facts which under the other criteria tend to establish that the shuttlers were Avis employees."

7. Each solicitor's work related to the heart of Gilmore's business. *Silk* involved coal loaders and truckers. The Supreme Court held the former to be employees, the latter not. In *Bartels* musicians were held employees of bandleaders, not of the ballrooms. In *Avis*, car shuttlers were held to be employees.

In *Elmore v. United States*, Civil No. 3371 (E.D.Va. July 16, 1962), in which the circumstances were similar to those in this case, then District (now Senior Circuit) Judge Field held that there was no employment relationship. But in *Elmore* there was no control of hours or place of work, formal sales meetings were not held, and the sale of magazines distributed by other companies was permitted and seemingly took place not too infrequently. In *Elmore*, also, there is no indication that plaintiff advanced funds to new solicitors or whether

or not solicitors were terminated for failure to meet what in this case were essentially sales goals, *i. e.*, sufficient sales to produce sufficient commissions to cover Gilmore's advances to a solicitor and the costs attributable to that solicitor. In his opinion in *Elmore*, Judge Field emphasized the opportunity to exercise individual "ingenuity, personality and resourcefulness" (at p. 4) and made no finding that a group had been highly structured by plaintiff therein as this Court finds was the case herein. The fact that a taxpayer has exercised control over the time and place, *inter alia*, in which those engaged perform their work, may not in and of itself require a determination of employee status. *See Filipidis v. United States, supra* at 595–96.[7]

In any event, the factor of control weighs heavily in the Government's favor in this case. But, in addition, factors other than the control in fact exercised directly and indirectly by plaintiff establish an employer/employee relationship herein. While only 20% of Gilmore's solicitors remained on the job for one month or more, the arrangements, pursuant to which each solicitor joined the group, called for him to remain a member for a period of indefinite duration. Thus, the solicitor's relationship to plaintiff was not limited to the solicitor's completion of one particular task. Additionally, the solicitors supplied no tools or other capital necessary to perform their job. Receipt forms and all materials needed by the solicitors were supplied to plaintiff by Local Readers Service and were in turn supplied by plaintiff to the solicitors. All necessary solicitation permits and fees were procured by plaintiff at his cost from each city's officials. And most important, all of each solicitor's work was a fractional and necessary part of plaintiff's regular business. The contract between plaintiff and each

---

7. In the case of real estate and securities brokers, however, that fact is a factor among others indicating the existence of such status. *See* Rev. Rul. 136–139, 1976–1 C.B. 312–319 relating to "securities and real estate salespeople." Where the latter receive only commissions, are not given advances against commissions, are provided at no charge with office facilities and supplies, pay their own transportation expenses and license fees, and generally attend but are not required to attend weekly sales meetings, they are not considered employees. The opposite is true where such salespeople do receive draws against commissions, are subject to being required to attend sales meetings and are discharged for not meeting sales quotas.

solicitor does, as indicated *supra*, state that the relationship was that of independent contractor, that his earnings were based on commissions, and that there were no other additional benefits such as vacation pay. In practice, both plaintiff and Local Readers Service in fact from time to time did offer and pay bonuses to plaintiff's solicitors to encourage sales. But neither that factor [8] nor any other factor can tip the balance in favor of a nonemployment relationship in the face of all of the factors which call for the opposite result. In this case, the facts establish far more factors supporting an employment relationship than are needed to establish the same. And it goes almost without saying that the label placed upon the relationship by the contract is of little import.[9]

## II

■ The Government has asserted a penalty against plaintiff under 26 U.S.C. § 6651(a) for failure to file employment tax returns for the years in question. 26 U.S.C. § 6651(a) provides in part that "in case of failure" to pay taxes of the type involved in this case, "unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added" certain amounts. It is the taxpayer's burden to establish that his failure was due to reasonable cause *and* not due to wilful neglect. *Burruss Land and Lumber Co., Inc. v. United States*, 349 F.Supp. 188 (W.D.Va. 1972). "Failure to file a return is due to reasonable cause if the taxpayer, in determining not to file the return, exercises ordinary business care and prudence." *K. O. Lee Co., Inc. v. United States*, 57–1 U.S.T.C. # 9491, at 56,956 (D.S.D. February 27, 1957).

Given all the circumstances herein, Gilmore did exercise ordinary business care and prudence. Accordingly, no penalty assessment will be allowed. Gilmore had been involved in the magazine subscription sales business in various capacities for ap-

---

**8.** The factors set forth in *Avis* have been discussed *supra. See also Aparacor, Inc. v. United States*, 556 F.2d 1004 (Ct.Cl. 1977). In that case, in which no employment relationship was held to exist, the Court reviewed in depth the facts and the applicable law. It is to be noted in *Aparacor* that there was an independent value to each distributor of that distributor's own respective business contacts with the person with whom he or she did business. There was also considerable competition for that relationship among the distributors. Those factors are not present herein. Moreover, the taxpayer in *Aparacor* was himself in the business of designing and supplying merchandise, not of distributing it, and arranged with those the Government unsuccessfully claimed to be employees, to distribute the products he designed and supplied.

**9.** "Contract recitations that a worker is either an employee or contractor were found [in *Silk, supra* 331 U.S. at 717–18, 67 S.Ct. 1463] to have no effect on tax liability." *Avis, supra* at 429.

Three other magazine subscription sales cases require discussion. In *Kalahar v. United States*, Civil No. 3555 (S.D.Miss. January 14, 1966), the Court found that the taxpayer exercised none of the usual control attributed to an employer, such as that over routes, hours worked and days off. The solicitors in *Kalahar* also made their own arrangements as to lodging and meals. They were determined not to be employees. Again, there are, however, a number of factual similarities to the case at bar. *Brady v. Periodical Publishers Service Bureau, Inc.*, 173 F.2d 776 (6th Cir. 1949) involved a situation in which most of the solicitors did not devote their entire time and attention to the work, but treated it rather as a sideline. They were held not to be employees. In *Meredith Publishing Company v. Iowa Employment Security Commission*, 232 Iowa 666, 6 N.W.2d 6 (1942), the Supreme Court of Iowa, in applying common law principles to determine whether or not an employment relationship existed, concluded, in a factual situation which has many similarities to that present in the case at bar, that there was no evidence of any right to control, or any exercise of control, over the individual solicitor or over the solicitor in charge of the individual solicitor, once they reached the area of solicitation, other than that each solicitor "was required to confine himself to the mail route assigned to him" by one of the sale agents "experienced in the work, [who] was placed at the head of the group." The type of man so placed is also described in the opinion in *Meredith* as "merely one of the solicitors." 6 N.W.2d, *supra* at 8–9. The route assignments were made "so that there would be no conflict in their [the individual solicitor's] canvassing." *Id.* at 9. In *Meredith* the control was much less than herein and was exercised by one of the group and the group structure so dominant herein was absent.

proximately fifteen years. He testified in this case that it was customary within the business to treat solicitors as independent contractors and not to pay the taxes at issue in this case. In the light of the similarities of the facts in *Elmore, Kalahar, Brady,* and *Meredith*, all discussed *supra*, and in this case, the views expressed and holdings stated in those other cases, and the many fine legal distinctions drawn therein and in Part I hereof, it was reasonable, even though it was incorrect, for plaintiff to assume that his solicitors were independent contractors and not employees. "Merely forgetting to file a return is not a reasonable cause, nor is ignorance of the law even on the part of non-residents of the United States, though misunderstanding due to reasonable doubt as to whether a return is required in view of conflicting rulings or decisions, or ambiguities in the law, may be an acceptable excuse." 10 Mertens, Law of Federal Income Taxation § 55.23 at 153–54 (1976) (footnotes omitted). *See Yeckes v. Commissioner*, 25 T.C.M. 924, 930 (U.S.T.C.1966).

Additionally, it is to be noted that plaintiff was audited on several occasions prior to the audit of his 1967, 1968 and 1969 returns. He testified that on two occasions during such audits, he was specifically asked by agents whether he withheld employment taxes from payments to his solicitors and specifically responded in the negative. No assessments were made against him growing out of those audits. In *Hugh Smith, Inc. v. Commissioner*, 8 T.C. 660, 677–78 (1947), a majority of the Tax Court noted and concluded:

> An internal revenue agent made a report on petitioner's income tax return for 1934 based upon his examination of that return and of the books and records of petitioner. * * * There was no suggestion in the report that petitioner was subject to tax on personal holding company income notwithstanding the fact that the revenue agent examined all the records of petitioner * * *.

> With all the facts before the revenue agent and the petitioner alike at the time the agent made his report on petitioner's

income for 1934 and the agent, presumably an expert, obviously holding the view that no cause whatsoever existed for holding petitioner liable for personal holding company tax for that year, it would seem that petitioner would be justified in holding the same view, and, that consequently, it had reasonable cause for not filing personal holding company returns for that year; and, by the same token, there having been no further examination of petitioner's records until the examination resulting in the deficiency herein, and the petitioner having in all subsequent years continued to conduct its business in the same manner and to receive the same character of income as it did in 1934, it would also seem that petitioner had reasonable cause for failing to file personal holding company returns for those subsequent years.

In *Druggists' Supply Corporation v. Commissioner*, 8 T.C. 1343, 1350–51 (1947), the Tax Court found and held as follows:

> There remains for consideration the propriety of respondent's action in assessing a penalty of $8,567.56 for failure to file an excess profits tax return for the taxable year 1940. It is conceded that no such return was filed. Under section 291 of the Internal Revenue Code, the penalty is to be imposed 'unless it is shown that such failure is due to reasonable cause and not due to willful neglect.' For 30 years petitioner has been filing its Federal income tax returns showing no income and showing these service fees credited to members as a liability for accounts payable. On at least two previous occasions the revenue agents have inquired of the petitioner about such treatment of these service fees. Upon being informed of the facts, those agents referred the question of the proper treatment of these fees to higher authority. Later, the revenue agents advised petitioner that its treatment was approved. Relying on this approval, petitioner filed no excess profits tax return for 1940, because such treatment resulted in no taxable income. We think such facts are

even more favorable to the taxpayer than those revealed in *Hugh Smith, Inc.*, 8 T.C. 660, in which we struck the penalty. Under such circumstances, we hold that the failure to file such return was based upon a reasonable belief that it was not required and that the imposition of the penalty is not justified.

In 10 Mertens, *supra* at 154, the author has written:

Asserted reliance upon statements of subordinate officials of the Service is not sufficient justification in all instances. In order to constitute reasonable cause, the taxpayer must prove he spoke with someone whose duty it was to advise taxpayers. It seems that a taxpayer may be excused for regarding silence of such officials, when thoroughly advised of and cognizant with his alleged return dereliction and the situation which would require a return, as an indication that none is required. If he is advised by an examining Agent, or the like, who is fully conversant with the facts or informed of them, that he need not file a return, or a particular type of return, the Tax Court has taken the position in some of its later decisions that he is entitled to rely thereon at least to the extent of being excused from the imposition of the penalty for failure to file. [Footnotes omitted.]

■ Reliance upon the statements of IRS officials has not been held to constitute reasonable cause in cases where doubt existed as to the completeness or accuracy of the information presented by the taxpayer to the official or in which, given the official's rank and/or position, it was unreasonable to rely upon his statement. *Saralee Lust v. Commissioner*, 34 T.C.M. 69, 70–71 (1975); *Precious Metals Developing Co., Inc. v. Commissioner*, 15 T.C.M. 1200, 1205 (1956); *Lawrence Block Co., Inc. v. Commissioner*, 12 T.C. 366, 369 (1949). In this case, however, in which an IRS agent was performing a general audit, there is no allegation that plaintiff withheld information or misled the agent. Further, there is evidence in this case that, if only briefly, the specific issue of employment taxes was dis-

cussed and their nonpayment revealed by plaintiff. In those circumstances, plaintiff's reliance upon the failure of the IRS previously to assess the taxes in question was reasonable.

In *The West End Co. v. Commissioner*, 23 T.C. 815, 820 (1955), the Tax Court, in holding a penalty assessment appropriate, observed and held:

Nothing was said on this issue [reasonable cause for failure to file] by the petitioner except its basic contention that it was not liable for the personal holding company surtax because it had no personal holding company income. However, it has not been shown how petitioner's officers arrived at this conclusion. There is nothing to indicate that this conclusion was based upon the opinion of reputable counsel or of other expert tax advisors who had been given all the facts regarding petitioner's debatable status. In fact, there is nothing to indicate that petitioner's officers even considered the possibility of liability for the personal holding company surtax until it was suggested by the respondent's claims. In such circumstances, we cannot find that petitioner's officers exercised the necessary business prudence to constitute reasonable cause for failure to file the required returns. *Wm. J. Lemp Brewing Co.*, 18 T.C. 586. Therefore, we hold that the penalty determined by the respondent is appropriate.

The record herein does not indicate whether plaintiff himself specifically considered the question of tax liability because of the possibility that his solicitors were legally "employees" rather than "independent contractors." The record does disclose that at no time did plaintiff consult with or rely upon the advice of an attorney in not paying the taxes in question. While both an attorney and an accountant apparently helped plaintiff to prepare his tax return, plaintiff admitted that he never specifically asked either the attorney or the accountant if the solicitors were employees or independent contractors. The opinion of an attorney has been held to provide a reasonable

ground for failure to pay the tax in question, even though the opinion ultimately proved to be erroneous. *See, e. g., Burruss Land and Lumber Co., Inc. v. United States,* 349 F.Supp. 188, 189 (W.D.Va.1972); *Cactus Heights Country Club v. United States,* 280 F.Supp. 534, 540–41 (D.S.D. 1967); *Spouting Rock Beach Corp. v. United States,* 176 F.Supp. 938, 942–43 (D.R.I. 1959). But neither those holdings nor *West End* establish the proposition that the advice of an attorney or an accountant is necessary before a taxpayer can prove his failure to pay was reasonable. Indeed, *K. O. Lee Co., Inc. v. United States, supra* at 56,956, in which it was "conceded that \* \* the taxpayer did not consult with a public accountant, and the record is very meager as to discussions the taxpayer had with its attorney on its tax matters," indicates that there is no such *per se* rule. In *Lee,* in which other certain mitigating factors not present herein, including a substantial overpayment of taxes, were present, the imposition of penalty was not permitted.

In sum, given the custom within the business, the legal decisions relating to the presence or absence of employee status on the part of magazine subscription solicitors, and plaintiff's discussion with an auditing IRS agent, it was reasonable for plaintiff to refrain from specifically questioning his IRS auditor on the subject and for him to rely upon the fact that after the audit, the IRS did not inform him that he owed any employment taxes. Thus, Gilmore has met the burden of proving that his failure was due to reasonable cause. While this "Court need not find that the taxpayer was guilty of willful neglect in order to subject" Gilmore to the penalties the Government seeks to impose and while "[t]he absence of reasonable cause is sufficient," 10 Mertens, *supra* at 153, in this case this Court concludes that there was not only no willful neglect but there was also reasonable cause.

### III

For the reasons set forth in this opinion, the Government is entitled to prevail as to the existence of the tax liabilities involved, but not as to the right to assess penalties. There remains for determination the amounts of the taxes due for the three years in question. Counsel have discussed the possibility that one or both sides may desire to seek interlocutory appellate review. *See* 28 U.S.C. § 1292(b). Counsel are directed to confer and to inform this Court in writing, separately or jointly, within two weeks from the date of this opinion, whether either party desires to seek such review, and if so whether either party opposes the same. Thereafter, this Court will rule upon any such request for interlocutory review and also establish a further schedule for proceedings in this case.