REVISED April 8, 2008

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

**United States Court of Appeals
Fifth Circuit**

**F I L E D**

March 19, 2008

Charles R. Fulbruge III
Clerk

No. 07-30015

TRANS-SERVE, INC.

Plaintiff - Appellant

v.

UNITED STATES OF AMERICA

Defendant - Appellee

Appeal from the United States District Court
for the Western District of Louisiana

Before JONES, Chief Judge, and WIENER and CLEMENT, Circuit Judges.

WIENER, Circuit Judge:

Plaintiff-Appellant Trans-Serve, Inc. ("Trans-Serve") disputes the amount of federal employment taxes that it owes for tax years 1987 through 1996. Trans-Serve contends that it owes only the ordinary federal employment taxes required by the Federal Insurance Contributions Act ("FICA")[1] and Federal Unemployment Tax Act ("FUTA").[2] The government counters that, as the district court held, Trans-Serve owes such taxes at the higher rates required by

---

[1] 26 U.S.C. § 3101 et seq.

[2] Id. § 3301 et seq.

the Railroad Retirement Tax Act ("RRTA")[3] and Railroad Unemployment Repayment Tax Act ("RURTA")[4] (the "Railroad Acts"). We affirm the district court's decision that Trans-Serve is responsible for Railroad Acts taxes and owes penalties and interest for its failure timely to pay the correct amount of such taxes.

## I. FACTS AND PROCEEDINGS

### A. Facts

Trans-Serve is a Delaware corporation headquartered in Vivian, Louisiana, engaged primarily in the business of manufacturing wooden railroad ties. For all times pertinent to this appeal, Trans-Serve was a wholly owned subsidiary of Southern Industrial Services, Inc., itself a wholly owned subsidiary of Kansas City Southern Industries, Inc. ("KCSI"), a holding company that owns myriad subsidiaries. From 1987 to 1996, Kansas City Southern Railway ("KCSR"), a Class I railroad that operated a rail carriage business, was another of these KCSI subsidiaries. For purposes of the Railroad Acts, KCSR was a "railroad carrier," and Trans-Serve and KCSR were under "common control."

Between 1980 and 1996, Trans-Serve primarily operated two businesses: Superior Tie & Timber ("ST&T"), which received, stored, and manufactured wood railroad ties; and Fleet Maintenance ("Fleet"), which repaired railroad vehicles owned by KCSR and other companies. In the years 1987 through 1996, ST&T generated between 85% and 92% of Trans-Serve's total revenues, and Fleet generated between 3% and 15.6% of Trans-Serve's revenues.[5]

---

[3] Id. § 3201 et seq.

[4] Id. § 3321 et seq.

[5] From 1984 through 1988, Trans-Serve operated a third division, ST&T Sawmill. The parties agree that Trans-Serve's sawmill business was irrelevant to the district court's determination that Trans-Serve is a "railroad employer" because the sawmill's operations were not closely related to railroad operations.

In 1978, KCSI decided to build a railroad-tie manufacturing and treatment plant that would produce and sell high-quality ties to railroad carriers, including KCSR, at a profit. KCSI chose Trans-Serve as the corporate entity to construct, own, and operate the plant, which was then built in Vivian, Louisiana on land adjacent to KCSR's main railroad line. The land for the plant was deeded to Trans-Serve by another KCSI subsidiary. The plant's construction was financed through industrial revenue bonds guaranteed by KCSI, and operations commenced in 1980 under the ST&T name.

Also in 1980, ST&T and KCSR entered into a sixteen-year agency agreement that required ST&T to meet KCSR's railroad tie needs before selling to other customers and authorized ST&T to act as an agent for KCSR in purchasing raw lumber from which to make railroad ties. Under this agreement, ST&T purchased such lumber on behalf of KCSR, stored it, treated it, made ties from it, and transported and delivered the ties to KCSR, all for a fee. ST&T would also sell KCSR finished ties that ST&T had produced using its own raw lumber. ST&T filled virtually all of KCSR's railroad tie needs. Although ST&T had and actively sought other customers, KCSR was Trans-Serve's supermajority customer from 1984 until 1996, when their agreement expired.[6]

Until 1996, Trans-Serve paid ordinary federal employment taxes under FICA and FUTA rather than the higher taxes required under the Railroad Acts. Between 1984 and 1996, the IRS audited Trans-Serve five times, determining each time that Trans-Serve was an "employer" under the Railroad Acts, and thus had under-reported and underpaid its employment taxes.[7] After each of its five audits, the IRS furnished Trans-Serve an examination report and a "thirty-day

_____

[6] From 1984 to 1996, 71.6% of ST&T's revenues came from KCSR and the remaining 28.4% came from other railroad customers.

[7] The IRS audited Trans-Serve's tax returns for the following years: (1) 1983 through 1986; (2) 1987 and 1988; (3) 1989 and 1990; (4) 1991 and 1992; and (5) 1993 through 1996.

letter" stating the basis for the assessments of additional tax and the time within which Trans-Serve could appeal.

Trans-Serve protested each examination report and appealed each tax assessment through the IRS's administrative appeals process, losing four of the five. Trans-Serve's only successful appeal was the first one, covering tax years 1983 through 1986, for which years the IRS Office of Appeals held that Trans-Serve had not been a "railroad employer." In each of Trans-Serve's four subsequent appeals, however, the Office of Appeals held that Trans-Serve was an "employer" under the Railroad Acts.

During each of its appeals, Trans-Serve entered into security agreements with the IRS which permitted it to postpone the payment of disputed taxes by posting a security bond. When the IRS denied the last of Trans-Serve's appeals in January 2000, Trans-Serve paid all Railroad Acts taxes that it owed.

B. Prior Proceedings

Trans-Serve filed the instant lawsuit in April 2000, seeking a refund of the higher Railroad Acts taxes that it had paid. Trans-Serve argued in the alternative that even if it denied this refund request, the court should not assess any interest or penalties for failure to pay taxes and should allow Trans-Serve to offset any FICA and FUTA taxes that it had paid during the relevant tax periods against the amount of Railroad Acts taxes owed.

After a bench trial, the district court ruled that Trans-Serve was not entitled to a refund because it was an "employer" under the Railroad Acts and that it owed interest and penalties. The court did, however, grant Trans-Serve's request for a credit for past employment taxes paid. Trans-Serve timely filed a notice of appeal.

## II. ANALYSIS

Trans-Serve asserts that the district court erred in holding that it: (1) is an "employer" under the Railroad Acts and thus subject to higher federal

employment taxes; (2) owes interest on the Railroad Acts taxes that it failed to pay from 1993 through 1996; and (3) owes penalties for its failure to pay Railroad Acts employment taxes from 1987 through 1992. We address each contention in order.

## A. "Railroad Employer"

### 1. Standard of Review

Whether a business is an "employer" under the Railroad Acts is a mixed question of law and fact.[8] When presented with such a question, we review the district court's fact findings for clear error and its legal conclusions and application of law to fact de novo.[9]

### 2. Merits

"Employers" within the meaning of the Railroad Acts must "pay extra federal taxes to finance the benefits afforded to their employees under the Railroad Retirement Act [("RRA")] and the Railroad Unemployment Insurance Act [("RUIA")]."[10] The Railroad Acts define "employer" not only as a railroad carrier but also as any company that: (1) is "directly or indirectly owned or controlled by" a railroad carrier or is "under common control" with such a carrier; and (2) "operates any equipment or facility or performs any service (except trucking service, casual service, and the casual operation of equipment or facilities) in connection with the transportation of passengers or property by railroad, or the receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, or handling of property transported by railroad . . . ."[11] As Trans-

---

[8] Standard Office Bldg. Corp. v. United States, 819 F.2d 1371, 1373-74 (7th Cir. 1987); Atl. Land & Improvement Co. v. United States, 790 F.2d 853, 855 (11th Cir. 1986).

[9] Payne v. United States, 289 F.3d 377, 381 (5th Cir. 2002).

[10] Livingston Rebuild Ctr., Inc. v. R.R. Ret. Bd., 970 F.2d 295, 296 (7th Cir. 1992).

[11] 26 U.S.C. § 3231(a).

Serve does not dispute the district court's determination that it and KCSR were under common control at all relevant times,[12] the only question is whether Trans-Serve meets the operational prong of the Railroad Acts' two-prong test for "employer" status, viz., whether Trans-Serve "perform[ed] any service . . . in connection with the transportation of passengers or property by railroad" during the tax years in question.

Although we have not previously addressed this precise issue, the Eleventh Circuit has. In Railroad Concrete Crosstie Corporation v. Railroad Retirement Board, that court held that a railroad carrier's wholly owned subsidiary which manufactured concrete railroad ties and did so predominantly for that carrier performed a "service in connection with" rail transportation, and thus was an "employer" under the Railroad Acts.[13] The court stated that "when [(1)] the nature of the relationship and the volume of sales between [the subsidiary] and [its parent] indicate that the subsidiary is economically dependent on the parent, and [(2)] when the type of product is so obviously essential to the functioning of the railroad, that the subsidiary's provision of the product [to the parent] constitutes a service to the parent . . . ."[14] The Eleventh Circuit rejected the tie manufacturer's argument that the manufacture and sale of a tangible commodity, e.g., railroad ties, did not constitute a "service" within

---

[12] The district court also held that Fleet was a "railroad employer" subject to taxes under the Railroad Acts. On appeal, Trans-Serve does not dispute this holding, but does contend (in two footnotes in its brief) that Trans-Serve as a whole should not be considered a "railroad employer" based on Fleet because Fleet only accounted for 3% to 15% of Trans-Serve's revenue during the period from 1987 through 1996. As we hold that Trans-Serve was a "railroad employer" by virtue of ST&T's business for those years, we need not address Trans-Serve's contention regarding Fleet.

[13] 709 F.2d 1404, 1411 (11th Cir. 1983). The three-judge Eleventh Circuit panel that heard Railroad Concrete Crosstie Corp. included Hon. James P. Coleman of the Fifth Circuit, who was sitting by designation. Id. at 1406.

[14] Id. at 1411.

the meaning of the Railroad Acts,[15] emphasizing that a RRA regulation explicitly states that a service or operation "is in connection with the transportation of passengers or property by railroad . . . if such service or operation is reasonably directly related, functionally or economically" to railroad "obligations."[16]  The Eleventh Circuit concluded that, because the subsidiary's "provision" of railroad ties was related both "functionally" and "economically" to the parent railroad company's operation as a carrier, the subsidiary performed a "service in connection with" transportation by rail, and was therefore liable for Railroad Acts taxes.[17]

We follow the Eleventh Circuit's convincing logic, which has also been adopted by the IRS,[18] and hold that Trans-Serve performed a "service in connection with" transportation by rail, qualifying it as an "employer" under the Railroad Acts.  First, Trans-Serve's ST&T division performed a "service" by manufacturing railroad ties and selling approximately three-fourths of its entire production to KCSR.  Trans-Serve's overarching reason for existence was to ensure the existence of a ready source of quality railroad ties for KCSR, which had the preferential right to purchase up to Trans-Serve's total production of

---

[15] Id. at 1408.

[16] Id. (quoting 20 C.F.R. § 202.7).

[17] Id. at 1411.

[18] In Revenue Ruling 85-177, the IRS specifically adopted the logic of the Eleventh Circuit's decision in Railroad Concrete Crosstie Corp.  Revenue Ruling 85-177 states:  "In situations similar to that in [Railroad Crosstie Corp.], in which a wholly owned subsidiary manufactures an item that is integral to the railroad operations of an employer affiliate and provides substantially all of its output to the employer affiliate, the taxes imposed by the Railroad Retirement Tax Act are applicable."  Rev. Rul. 85-177, 1985-2 C.B. 203.  Although IRS revenue rulings are not binding on courts, they generally are accorded significant weight.  See St. David's Health Care Sys. v. United States, 349 F.3d 232, 239 n.9 (5th Cir. 2003); see also Foil v. Comm'r, 920 F.2d 1196, 1201 (5th Cir. 1990) (revenue rulings are "entitled to respectful consideration" and are "to be given weight as expressing the studied view of the agency whose duty it is to carry out the statute," unless they conflict with the statute or its legislative history or are unreasonable (internal quotations omitted)).

ties. ST&T had performed additional services for KCSR, including receiving, treating, storing, and transporting railroad ties; but, as the district court pointed out, the fact that one of these services may result in a new "product" does not alter the fact that ST&T provided services to KCSR that were directly related to its railroad operations.

Second, the services that ST&T provided to KCSR were indisputably "in connection with" railroad transportation. Trans-Serve could not and would not have existed but for KCSR's need for a reliable source of quality ties. Trans-Serve is not truly a separate profit center. Crossties, like railway beds, tracks, switches, and rolling stock, are essential to, and thus "in connection with," transportation by rail. As Trans-Serve is related to KCSR both functionally and economically, we affirm the district court's holding that Trans-Serve is a "railroad employer."

## B. Interest[19]

### 1. Standard of Review

Whether a taxpayer is entitled to an interest-free adjustment turns on questions of law and statutory interpretation, which we review de novo.[20]

### 2. Merits

The district court correctly held that Trans-Serve owes interest on the RRTA taxes that it failed to pay from 1993 through 1996. As a general rule, taxpayers are required to pay interest on taxes that they owe but fail to pay.[21] Under specified circumstances, however, employers that underpay employment

---

[19] Trans-Serve does not dispute that it is responsible for interest accrued on its RURTA tax liability (only $6,998.40 from 1993). At issue is whether it is responsible for interest accrued on its RRTA tax liabilities from 1993 to 1996.

[20] See Brown v. Brown & Williamson Tobacco Corp., 479 F.3d 383, 387 (5th Cir. 2007); In re ADM/Growmark River Sys., Inc., 234 F.3d 881, 886 (5th Cir. 2000).

[21] 26 U.S.C. § 6601(a) ("If any amount of tax imposed by this title . . . is not paid on or before the last date prescribed for payment, interest on such amount . . . shall be paid . . . .").

taxes are permitted to amend their tax returns and remit the balance of taxes owed without having to pay interest.[22] In particular, an employer may make an interest-free adjustment of an underpaid tax if the employer reports the additional amount due within the same year that the error causing the underpayment is "ascertained,"[23] viz., "when the employer has sufficient knowledge of the error to be able to correct it."[24]

Whether Trans-Serve owes interest on the RRTA taxes that it failed to pay from 1993 through 1996 turns on when Trans-Serve "ascertained" its error. The district court relied on IRS Revenue Ruling 75-464, which equates ascertainment of error with the conclusion of an appeals process,[25] in holding that Trans-Serve was not entitled to an interest-free adjustment on its employment taxes for the period from 1993 through 1996. The court emphasized that, by the end of 1995,

---

[22] Id. § 6205(a)(1) ("If less than the correct amount of tax . . . is paid with respect to any payment of wages or compensation, proper adjustments, with respect to both the tax and the amount to be deducted, shall be made, without interest, in such manner and at such times as the Secretary may by regulations prescribe.").

[23] 26 C.F.R. § 31.6205-1(a)(3) ("Every return or supplemental return on which an underpayment is corrected pursuant to this section must have securely attached as a part thereof a statement explaining the correction, designating the return period in which the error was ascertained and the return period to which the error relates, and setting forth such other information as may be required by the regulations in this subpart and by the instructions relating to the return." (emphasis added)).

[24] Id. § 31.6205-1(a)(4).

[25] The final paragraph of Revenue Ruling 75-464 identifies two exceptions to interest-free treatment that equate ascertainment of error with the conclusion of an appeals process: (1) "cases in which the taxpayer's returns for prior years were audited and additional tax found to be due with respect to the same issue involved in the current audit"; and (2) "cases in which the taxpayer, after having been informed of his tax status as an employer, knowingly underreports his employment tax liability in subsequent years." Rev. Rul. 75-464, 1975-2 C.B. 474; see also Atchison, Topeka & Santa Fe Ry. Co. v. United States, 61 Fed. Cl. 84, 89 (2004) (holding that Revenue Ruling 75-464 "appears to treat 'ascertainment of the error' as synonymous with the conclusion of the administrative [appeals process], but in no event later than receipt of notice and demand. The tax payment is thus interest-free if the tax is paid at the conclusion of administrative appeals, but prior to filing a refund claim and prior to the IRS issuing a notice and demand.").

the IRS Office of Appeals had concluded — on three separate occasions — that Trans-Serve was a "railroad employer" and owed RRTA taxes.[26] Trans-Serve insists that the district court erred by relying on Revenue Ruling 75-464 and failing to apply the requirements of 26 C.F.R. § 31.6205-1(a)(4), under which an error is ascertained not when an administrative appeals process has been concluded but when "the employer has sufficient knowledge of the error to be able to correct it." Trans-Serve argues that it did not have the knowledge necessary to "ascertain" its error until the IRS appeals office denied its final appeal in 2000. Trans-Serve endeavors to support this argument by citing Eastern Investment Corporation v. United States, in which the Tenth Circuit held that a taxpayer "ascertained" its error once it had "exhausted all appeal rights within the [IRS], and the Appeals Office had notified [the taxpayer] of its determination . . . ."[27] Trans-Serve insists that, because it paid RRTA taxes for the period from 1993 through 1996 in 1999 — before the IRS decided its final appeal in 2000 — it is entitled to an interest-free adjustment for these years.[28]

Trans-Serve's arguments are unpersuasive. First, the district court did not err in relying on Revenue Ruling 75-464. Twenty-Six C.F.R. § 31.6205-1(a)(4) does not define the "knowledge" required to "ascertain" error, so the district court correctly looked to Revenue Ruling 75-464 for guidance. Even though, as noted earlier, IRS revenue rulings are not binding on courts, we

---

[26] As previously noted, the IRS's three appeals decisions relating to Trans-Serve's tax disputes were issued in April 1991, July 1994, and December 1995. On all three occasions, the IRS concluded that Trans-Serve was a "railroad employer."

[27] 49 F.3d 651, 657 (10th Cir. 1995).

[28] Under 26 C.F.R. § 31.6205-1(a)(6), an employer is not entitled to an interest-free adjustment after it has received a statement of notice and demand from the IRS for payment of additional tax. Trans-Serve does not argue that it is entitled to an interest-free adjustment for the years 1987 through 1992 for this reason — because, from 1987 to 1992, Trans-Serve had received notice and demand letters specifying that Railroad Acts taxes had been assessed before Trans-Serve paid these taxes. For the 1993 through 1996 period, however, Trans-Serve paid its Railroad Acts taxes before receiving a notice and demand letter from the IRS.

"generally accord significant weight to the determinations of the IRS in its revenue rulings."[29] Second, under the standard of Revenue Ruling 75-464, which equates ascertainment of error with the conclusion of an appeals process, Trans-Serve had "ascertained" its error by the time that it paid RRTA taxes for 1993 through 1996, well before 1999. On three successive occasions before 1999, the IRS Office of Appeals had already determined — in 1991, 1994, and 1995 — that Trans-Serve was a "railroad employer." Third, contrary to Trans-Serve's contention, our conclusion that Trans-Serve did not "ascertain" its RRTA tax liability in time to qualify for the interest-adjustment exception is consistent with Eastern Investment Corporation, in which the Tenth Circuit held that a taxpayer had "ascertained" its error once the IRS had denied a (not every) related appeal.[30] Trans-Serve might not have completely exhausted the IRS appeals process until 2000, but, as of late 1995, it had received three adverse appeals-office decisions on which it was required to rely. We hold that Trans-Serve owes interest on its RRTA taxes for tax years 1993 through 1996.

## C. Penalties

### 1. Standard of Review

What elements constitute "reasonable cause" for a late filing under 26 U.S.C. § 6651(a) is a question of law which we review de novo.[31] Whether those elements are present in a given case is a question of fact which we review for clear error.[32]

---

[29] See supra note 18.

[30] 49 F.3d at 657.

[31] United States v. Boyle, 469 U.S. 241, 249 n.8 (1985) ("[W]hat elements must be present to constitute 'reasonable cause' is a question of law."); Staff IT, Inc. v. United States, 482 F.3d 792, 798 (5th Cir. 2007) (citing Boyle).

[32] Boyle, 469 U.S. at 249 n.8; Roberts v. Comm'r, 860 F.2d 1235, 1241 (5th Cir. 1988) ("In accordance with Boyle, we shall review the Tax Court's findings regarding the existence or presence of circumstantial factors which might have given rise to reasonable cause under

2. Merits

Irrespective of whether we were to review its penalties rulings de novo or for clear error, we would conclude that the district court correctly imposed failure-to-pay penalties on Trans-Serve for tax years 1987 through 1992. Under § 6651(a)(3), the IRS may impose penalties on taxpayers whose tax returns fail to reflect their full tax liability and who are subsequently assessed unpaid taxes. To avoid failure-to-pay penalties, the taxpayer must "bear[] the heavy burden of proving"[33] that its failure to pay all taxes timely was the result of "reasonable cause" and not "willful neglect."[34] To establish reasonable cause, the taxpayer must demonstrate that it exercised "ordinary business care and prudence" in providing for the payment of its tax liability but "was nevertheless unable to pay the tax" on time or "would suffer an undue hardship . . . if [it] paid on the due date."[35] "Willful neglect" is defined as "conscious, intentional failure or reckless indifference."[36]

Trans-Serve asserts that the district court erred in holding it liable for failure-to-pay penalties for tax years 1987 through 1992 because its failure to pay Railroad Acts taxes was the result of reasonable cause and not willful neglect. According to Trans-Serve, it had reasonable cause not to pay because: (1) the IRS permitted Trans-Serve to post a bond to secure payment of its tax liabilities and delayed assessment of failure-to-pay penalties, thereby implying to Trans-Serve that its status as a "railroad employer" was uncertain; and (2) in

---

the clearly erroneous standard.").

[33] Boyle, 469 U.S. at 245.

[34] 26 U.S.C. § 6651(a); Treas. Reg. § 301.6651-1(c)(1).

[35] Treas. Reg. § 301.6651-1(c)(1); see also Boyle, 469 U.S. at 245.

[36] Boyle, 469 U.S. at 245.

1989, the IRS Office of Appeals determined that Trans-Serve was not a "railroad employer."

We are not persuaded by either contention.[37] The record satisfies us that the bond was simply an accommodation to Trans-Serve, and that the IRS's failure to assess penalties sooner was not an implicit signal of doubt but merely a result of bureaucratic slow pace.

Equally unconvincing is Trans-Serve's contention that the IRS's March 1989 appeals decision, which concluded that Trans-Serve was not a "railroad employer," constituted reasonable cause not to pay Railroad Acts taxes. It is not pellucid whether a taxpayer's reliance on prior IRS decisions, audits, or advice may constitute reasonable cause;[38] but, even if, arguendo, an IRS decision alone could boost Trans-Serve's decision not to pay Railroad Acts taxes over the reasonable-cause bar, Trans-Serve conveniently fails to acknowledge that, under § 6651(a)(3), failure-to-pay penalties accrue twenty-one days after notice and demand for owed taxes is furnished, not on the original due date of the return.[39]

---

[37] Trans-Serve cites only one case in support of this argument, an unpublished district court opinion that is easily distinguishable. In Ferwerda v. United States, No. 78-C-195, 1979 WL 1484, at *5 (E.D. Wis. Sept. 14, 1979), the district court held that taxpayers had reasonable cause to delay the payment of taxes because they had entered into an agreement with the IRS to delay collection of taxes until after the resolution of their bankruptcy proceedings. The district court also focused on "the pending bankruptcy proceedings and the uncertainty over the final amount due" to the IRS. Id. at *6. Here, there was neither any agreement not to collect, but rather an agreement permitting Trans-Serve to post a bond to secure payment, nor any additional factors, such as a pending bankruptcy proceeding.

[38] For the argument that reliance on IRS rulings and audits constitutes reasonable cause, see H. Fort Flowers Found., Inc. v. Comm'r, 72 T.C. 399, 410-11 (1979) (tax exempt organization had reasonable cause not to file return because of IRS audit findings); Gilmore v. United States, 443 F. Supp. 91, 98-99 (D. Md. 1977) (employer had reasonable cause not to file returns under FICA and FUTA because of previous IRS audit determinations); cf. Posey v. United States, 449 F.2d 228, 234 (5th Cir. 1971) (taxpayer cannot establish reasonable cause based upon purported reliance on advice from IRS); United States v. Red Stripe, Inc., 792 F. Supp. 1338, 1345 (E.D.N.Y. 1992).

[39] See 26 U.S.C. § 6651(a)(3) (penalties accrue in case of failure "to pay any amount in respect of any tax required to be shown [as a tax] on a return . . . which is not so shown . . . within 21 calendar days from the date of notice and demand therefor . . . .").

To determine whether Trans-Serve had reasonable cause for its failure to pay its Railroad Acts taxes for 1987 through 1992, therefore, we look to when the IRS first demanded that Trans-Serve pay these taxes. When we do, we see that the IRS Office of Appeals determined that Trans-Serve was a "railroad employer," and thus demanded payment of Railroad Acts taxes, in April 1991 for 1987 and 1988; in July 1994 for 1989 and 1990; and in December 1995 for 1991 and 1992. Even though the IRS had concluded in March 1989 that Trans-Serve was not a "railroad employer" for 1983 through 1986, the demand-payment dates in 1991, 1994, and 1995 for years 1987 through 1992 all occurred after at least one appeals-office decision had come to a conclusion diametrically opposed to that office's March 1989 decision. After that 1991 change of position, there was no way that Trans-Serve could have reasonably relied on the IRS's old appeals determination from March 1989 that it was not a "railroad employer." On every subsequent occasion that the IRS had demanded that Trans-Serve pay Railroad Acts taxes for the period from 1987 through 1992 — in 1991, in 1994, and in 1995 — at least one supervening IRS appeals-office decision had determined that Trans-Serve was a "railroad employer." If the IRS had demanded that Trans-Serve pay Railroad Acts taxes before its March 1989 appeals-office decision was supplanted, Trans-Serve's argument that it relied on the March 1989 ruling might hold water. As failure-to-pay penalties accrue only after the IRS has given notice and demand of taxes due, however, and not on the original due date of the return, Trans-Serve's proffer of the IRS's March 1989 determination as reasonable cause not to pay its Railroad Acts taxes for 1987 through 1992 is specious. The district court correctly concluded that Trans-Serve owes failure-to-pay penalties for the tax years at issue.

## III. CONCLUSION

The district court properly ruled that Trans-Serve is an "employer" within the meaning of the Railroad Acts and thus subject to the higher federal employment taxes imposed under those statutes. Consequently, Trans-Serve is not entitled to a refund on the Railroad Acts taxes it paid for tax years 1987 through 1996, and must pay interest and penalties on these back taxes. The district court's judgment is, in all respects, AFFIRMED.