NATIONAL LABOR RELATIONS
BOARD, Petitioner and
Respondent,

v.

TECHNICOLOR MOTION PICTURE
CORPORATION and Local 683 of the
International Alliance of Theatrical
Stage Employees and Moving Picture
Machine Operators of the United States
and Canada, A.F.L.–C.I.O., Respondents
and Cross-Petitioners.

No. 15297.

United States Court of Appeals
Ninth Circuit.

Sept. 24, 1957.

Kenneth C. McGuiness, General Counsel, Stephen Leonard, Associate General

Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Owsley Vose, Frederick U. Reel, Attorneys, N. L. R. B., Washington, D. C., for petitioner.

Cohen & Roth, Beverly Hills, Cal., Gilbert, Nissen & Irvin, Robert W. Gilbert, Los Angeles, Cal., for respondent.

Edward J. Hickey, Jr., Washington, D. C., for amicus curiæ, Railway Labor Executive's Ass'n.

Before HEALY, BARNES and HAMLEY, Circuit Judges.

BARNES, Circuit Judge.

The National Labor Relations Board, acting pursuant to Section 10(e) of the National Labor Relations Act, as amended,[1] seeks a decree enforcing its Order issued against Respondents Technicolor Motion Picture Corporation and Local 683 of the International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators of the United States and Canada, A.F.L.-C.I.O., (hereinafter referred to respectively as "the Company" and "the Union"), following a finding of unfair labor practices committed by them. The named Respondents cross-petition to have the Order set aside.

The petition and cross-petition raise an important and apparently novel question concerning the construction of (1) the first proviso to Section 8(a) (3) of the Act, which authorizes an employer and a labor organization to enter into a collective bargaining agreement, one of the terms of which may be "to require as a condition of employment membership (in the union) on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later," provided certain prerequisites are met;[2] and

(2) an agreement executed thereunder. The question is whether or not an employee's belated tender of a delinquent union initiation fee, made prior to actual discharge, renders unlawful a subsequent discharge based upon non-compliance with the time provisions of an admittedly valid union security agreement.

The formal pleadings and a stipulation of material facts, including two exhibits, comprise the entire record in the instant case.[3] The stipulation discloses that on or about July 31, 1954, the Company and the Union executed a valid union security contract requiring *inter alia* that all persons then in the Company's employ subject to the agreement become and remain union members on and after the thirtieth day following the effective date of the agreement (which was the date of execution) and that within "a reasonable time, but not to exceed 3 days, after receipt of written notice from the Union that any such employee is not a member as above required," the Company "shall discharge any such employee." Hayden Balthrope, an employee of the Company, did not apply for membership in the Union nor tender his initiation fees during the thirty day grace period, although he was apprised of the union security provisions of the agreement shortly after its execution. Consequently, on August 31, 1954, the Union, in accordance with the terms of the agreement, made a lawful written demand on the Company calling for Balthrope's discharge within three days thereafter. No action was taken on this demand. The Union repeated its demand on October 1, 1954, and subsequently made numerous oral demands for Balthrope's discharge until some unspecified date in January of 1955. All of these demands went unheeded. The stipulation states that the Com-

---

1. 61 Stat. 136, 29 U.S.C.A. § 160(e).

2. It is undisputed that these other prerequisites were fulfilled, i. e., majority status of the bona fide Union; compliance by the Union with the filing requirements of Section 9(f), (g) and (h); and, availability of union membership to Balthrope "on the same terms and conditions gen-

erally applicable to other members." Accordingly, discussion of these prior essentials is unwarranted.

3. Each party was given an opportunity to call witnesses or offer evidence before the Trial Examiner and each declined to do so.

pany's failure to accede to these demands was based on "unexplained" reasons. No further enlightenment is shed on this point by the record. Meanwhile, on December 7, 1954, after steadfastly refusing to do so for over four months, Balthrope applied for Union membership and tendered a check in the amount of $250.-00, the established initiation fee uniformly required of all prospective members and the only sum requested by the Union. On or about January 27, 1954, Balthrope informed the Company of the action he had taken.[4] His application for membership was conditionally approved by the Executive Board of the Union on February 7, 1955. Three days later, February 10, 1955, the Company discharged him. The stipulation is silent as to whether the Company knew of the Union's acceptance of Balthrope's initiation fee when it discharged him. That very same day and after it was notified of Balthrope's discharge, the Union wrote him that its Executive Board had conditionally approved his application for membership and that it had arranged employment for him at a comparable wage rate with another employer in the same industry.

Upon a charge lodged by Balthrope based on the foregoing facts, the General Counsel of the Board issued a consolidated complaint against the Union and the Company alleging that the Union by causing the Company to discharge Balthrope after he had paid his initiation fee violated sections 8(b) (1) (A) and 8(b) (2) of the Act and that the Company by yielding to the Union's demand violated sections 8(a) (1) and 8(a) (3) of the

Act.[5] A hearing was held before a trial examiner on the stipulated facts. The Trial Examiner then filed an exhaustive Intermediate Report concluding that there was no violation of the Act by either the Company or the Union and recommending that the consolidated complaint be dismissed. The Board, by a three to two vote, reversed the Trial Examiner's ultimate findings and sustained all of the charges contained in the consolidated complaint.[6] It ordered the Respondents to cease and desist from the unfair labor practices, effectuate Balthrope's reinstatement with back pay and post specified notices regarding their future conduct.

In reaching their decision the Board's majority relied without discussion on the broad doctrine promulgated by the Board in the Aluminum Workers case.[7] That case, involving an employee purportedly delinquent in the payment of her periodic union dues, held that "* * * a full and unqualified tender made any time prior to actual discharge, and without regard as to when the request for discharge was made, is a proper tender and a subsequent discharge based upon the request is unlawful." The two dissenting Board members, like the Trial Examiner, felt the Aluminum Workers doctrine was inapplicable to a case involving an initiation fee because of the different treatment accorded initiation fees and periodic dues in the Act and certain fundamental distinctions between them with respect to an employee's obligations to a union.

■ Our initial concern is, of course, with the germane provisions of the Act

4. This factual statement was not included in the stipulation. It is based on an allegation of the consolidated complaint which the Respondent Company did not deny and hence, under well settled rules of pleading, thereby admitted. Although the Respondent Union's answer contained a denial as to this allegation based upon lack of information and belief, the Trial Examiner concluded that since the substance of the allegation dealt exclusively with a matter within the Company's

knowledge, the Company's implied admission was sufficient to prove the fact. We agree.

5. 61 Stat. 136, 29 U.S.C.A. § 151 et seq.

6. The Board's Decision and Order are reported at 115 N.L.R.B. 1607.

7. Aluminum Workers International Union, 112 N.L.R.B. 619, enforcement granted, N.L.R.B. v. Aluminum Workers International Union, 7 Cir., 230 F.2d 515.

and, for purposes of clarity, we deem it desirable to set forth those subsections at the outset of our discussion. The first proviso to § 8(a) (3), which sanctions union security agreements, has been noted already. § 8(a) (1) (relating to the employer) and § 8(b) (1) (A) (relating to the union) make it an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of rights guaranteed in section 7;" which include "the right to refrain" from union activities "except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 8(a) (3)." Further, § 8(a) (3), made applicable to unions by § 8(b) (2), prohibits an employer from "discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization" except as provided in the succeeding proviso authorizing union security agreements. Even under such a union security agreement any discrimination based on non-membership is strictly limited. An employee need only tender his initiation fee and periodic dues to avoid discriminatory action including, of course, discharge. This is made clear by the second proviso to § 8(a) (3) that under a union security agreement an employer cannot justify discrimination against an employee for non-membership in the union if he has reasonable grounds for believing that such membership "was not available to the employee on the same terms and conditions generally applicable to other members, or * * * was denied or terminated for reasons other than the failure of the employee to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership." Likewise, a union is forbidden by § 8(b) (2), "To cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership."

We understand the Board's position to be that the above statutory provisions embody Congressional recognition of the problem of so-called "free riders;" (i. e., those employees who enjoy the benefits of union representation under union agreements without contributing to the financial support of the union by paying initiation fees and periodic dues), and authorization to deal with this problem by permitting unions operating under such agreements to cause the discharge of those employees who are "free riders;" that Balthrope was such a "free rider" after the expiration of the thirty day grace period; that under the Act and the collective bargaining agreement the power was vested in the Union to cause, and the Company to effect, a lawful discharge of Balthrope so long as the initiation fee remained due and untendered; that upon tender of his initiation fee Balthrope ceased to be a "free rider," and concomitantly the power to discharge him was lost; that any subsequent demand by the Union for his discharge was necessarily for a reason other than the *failure* to pay the initiation fee, and similiarly, his discharge was for a reason other than the *failure* to pay the initiation fee; and hence both the Union and the Company were guilty of the unfair labor practices as charged.

Respondents assert that the Act allows execution of a collective bargaining agreement requiring an employee subject to a union security contract to join the union or at least tender his initiation fee within the thirty day grace period; that this statutory authorization enables a union to insist upon the timely submission of uniformly required initiation fees; and that an employee who fails to tender his fee within the required period cannot by a tardy attempt to meet his contractual obligation forestall his

discharge for failure to comply with the terms of the agreement.

■ It is readily apparent from an analysis of the arguments of all parties that there exists a wide area of unanimity of opinion. They agree, and we think correctly, that the Act severely circumscribes the authority of labor organizations and employers to enter into collective bargaining agreements making union membership a condition of employment.[8] The general policy of the Act is to effect a separation between an employee's job rights and union activities. Radio Officers' Union of Commercial Telegraphers Union v. N. L. R. B., 347 U.S. 17, 40, 74 S.Ct. 323, 98 L.Ed. 455; see also Note, The Ability of A Union to Cause a Discharge For Nonpayment of Dues Under The Taft-Hartley Act, 45 Geo.L.J. 250 (1956–57). The union security provision, the lone exception to this general policy, is restricted and qualified. Even where, as in the instant case, all the statutory requirements of a valid union shop agreement are met, the Act provides that the only ground upon which an employee can be lawfully discharged is for non-payment of initiation fees or periodic dues. Nothing else suffices. Cf. Union Starch & Refining Co. v. N. L. R. B., 7 Cir., 186 F.2d 1008, 1009, 27 A.L.R.2d 629, certiorari denied 342 U.S. 815, 72 S.Ct. 30, 96 L.Ed. 617. As stated by the Supreme Court in Radio Officers' Union, 347 U.S. at page 41, 74 S.Ct. at page 336,

"This legislative history clearly indicates that Congress intended to prevent utilization of union security agreements for any purpose other than to compel payment of union dues and fees. Thus Congress recognized the validity of the unions' concerns about 'free riders,' i. e., employees who receive the benefits of union representation but are unwilling to contribute their share of the financial support to such union, and gave union the power to

contract to meet that problem while withholding from unions the power to cause the discharge of employees for any other reason. Thus an employer can discharge an employee for nonmembership in a union if the employer has entered a union security contract valid under the Act with such union, and if the other requirements of the proviso are met. No other discrimination aimed at encouraging employees to join, retain membership, or stay in good standing in a union is condoned."

If the employee pays his fees and dues he is protected from discharge. The critical question, and one which causes a divergence of viewpoint, is whether the union security proviso which empowers unions and employers to make agreements by the terms of which employees are required to join the union within the thirty day grace period (and an agreement executed thereunder) means that the employees *must* join the union during this period in order to avert possible discriminatory treatment or whether it is enough that they join at any time prior to actual discharge.

■ Neither the literal language of the Act itself nor its legislative history furnishes an explicit answer to this precise issue. However, we think in light of its legislative background, a fair interpretation of the union shop proviso to § 8(a) (3) is that it authorizes the execution of collective bargaining agreements which make time of the essence with regard to the tender of initiation fees within the thirty day grace period allowed by the proviso. We hold further that a reasonable construction of the collective bargaining agreement involved in the instant case is that it in fact so provides. On its face the proviso permits agreements which "require" employees to initiate union membership within a specified time. The payment of initiation fees is the first step in acquiring union membership. The imperative

---

8. The Act not only limits the employee's duty under a union shop agreement to the payment of initiation fee and periodic dues but it also outlaws closed shop agreements.

character of the phrase "to require" followed by a definite time period for compliance during which period discrimination based on non-membership is expressly proscribed, indicates, we believe, a Congressional intent to permit discrimination based on the failure to tender uniformly required initiation fees where the employee has not fulfilled his obligation within the period expressly granted for his protection.

■ This conclusion that the Union can insist upon timely submission of initiation fees is reinforced by the legislative history of the Taft-Hartley Act. The conference and committee reports as well as the debates on the floor abound with statements emphasizing the prime significance of the thirty day grace period in relation to the employee's job rights. The original House Report on the Hartley bill (H.R. 3020, 80th Cong. 1st Sess.) declared that the bill

" * * * permits an employer and a union voluntarily to enter into an agreement *requiring* employees to become and remain members of the union a month or more after the employer hires them or after the agreement is signed, * * * (so that) Employees have 30 days to decide whether or not to join the union." House Report No. 245, 80th Cong., 1st Sess., pp. 9 and 34.

The Senate Report on the union security provisions of the Taft bill (S. 1126, 80th Cong., 1st Sess.), which were incorporated in substantial part in the Act, stated that under the Taft bill

" * * * employers would still be permitted to enter into agreements *requiring* all the employees in a given bargaining unit to be-

come members 30 days after being hired * * *."

See also the Conference Report on the Act. House Conference Report No. 510, 80th Cong., 1st Sess., June 3, 1947, pp. 41 and 44.

During the course of the heated and prolonged debates that marked the passage of the Taft-Hartley Act, Senator Taft, co-author of the Act, addressing himself to the union security provisions of his bill, declared that "the employee must join the union within 30 days after he is employed" (93 Congressional Record 5087), after having previously said that "an employer may employ anyone whom he chooses to employ, but after 30 days such employee has to join the union or else the employer can no longer employ him." 93 Congressional Record 3952.[9]

Although the legislative materials contain no explicit reference to the effect of late tender of initiation fees on the power to cause the discharge or to discharge an employee who breached his obligation to tender the fees within the specific time limitation authorized by the statute and provided for in the contract, the implication is strong from the great importance attached to the grace period that *timely* tender is required to prevent a lawful discharge of the employee in the absence of circumstances which forestall the union or employer from relying on the employee's failure to pay the fees.

This construction of the Act is identical to that adopted by the Board after the enactment of the statute and followed consistently until the Aluminum Workers case.[10] We think its original position is correct. Congress expressly allowed employees thirty days in which to join the union or to at least tender

9. Similar statements were voiced by Senator Smith (93 Congressional Record 3952), Senator Thye (93 Congressional Record 5087), Senator Donnell (93 Congressional Record 5091), and Senator Ball (93 Congressional Record 5147). All these comments state in the imperative the employee's duty to join the union within the thirty-day grace period.

10. Matter of Chisholm-Ryder Co., 94 N.L.R.B. 508; Matter of Ferro Stamping & Mfg. Co., 93 N.L.R.B. 1459. See also the Board's annual reports to Congress. N.L.R.B. Nineteenth Annual Report, p. 90; Eighteenth Annual Report, p. 41; Seventeenth Annual Report, pp. 147 and 152; Sixteenth Annual Report, p. 185.

their initiation fees under a union security agreement. Additional safeguards were not enacted. Accordingly, it perverts the legislative mandate to enlarge the scope of protection afforded employees. To do so would not only frustrate the manifested intention of Congress but also would tend to stimulate industrial instability. The effective enforcement of union security provisions of collective bargaining agreements depends in large measure upon the authority and capacity of unions to invoke the sanction of loss of employment against those non-union employees who fail to join the union or tender their initiation fees. If those employees were to be permitted to disregard with impunity the thirty day time limitation and refrain from tendering their fees until just prior to discharge, the persuasive force of the statutory sanction granted unions would be drastically diluted. The number of employees refusing to join unions within the thirty-day grace period would almost certainly increase if unions were unable to cause the discharge of employees for non-compliance with the terms of collective bargaining agreements. Even if payments were eventually forthcoming, the delay and harassment involved in securing the fees would prejudice the orderly and efficient administration of the internal affairs of unions. Another consequence of the Board's holding would be to grant unilateral power to employers for some period, at least, to control the fate of employees who had not tendered initiation fees on time by either admonishing them to pay the fees and deferring the decision on discharge until the employee fulfilled his obligation [11] or else discharging them immediately. As stated by the Second Circuit in a very recent decision, International Ass'n of Machinists, A.F.L.-C.I.O. v. N. L. R. B., 247 F.2d 414, 420:

"It seems clear to us that Congress did not intend that the efficacy of valid union security provisions should depend solely upon an employer's willingness to act promptly upon a request for an employee's discharge when the validity of that request is not in issue."

It appears equally evident that to prevent unions from taking effective action to secure the prompt payment of initiation fees would not be conducive to healthy industrial relations. To allow unions the power to discipline by discharge those employees who procrastinate beyond the statutory and contract deadline for becoming union members avoids, we believe, the discordant ramifications of the Board's holding and accords with the general purposes and objectives of the Act.

It is important to note that the sweeping doctrine of the Aluminum Workers case has never received judicial approval in its own delinquent dues setting but on the contrary was expressly rejected by the only Circuit to pass on the issue. In the Aluminum Workers case itself the Seventh Circuit in granting enforcement to the Board's order held that a proper and valid tender of dues had been made by the employee prior to the request for discharge.[12] It explicitly refrained from passing on the broader holding of the Board. In International Ass'n of Machinists, A.F.L.-C.I.O. v. N. L. R. B., supra, the Second Circuit held that the Aluminum Workers doctrine "is an incorrect statement of the law." It held that a union could lawfully compel the discharge of a delinquent member under a union security agreement despite a belated tender of dues.[13]

11. In such a situation the union might have recourse against the employer for breach of the collective bargaining agreement under Section 301 of the Labor-Management Relations Act of 1947, 29 U.S.C.A. § 185.

12. The Court held that the union wrongfully refused a valid first tender made by the employee. It held further that under the practice developed by the union and the employer the employee's second tender, made prior to the union's demand for discharge, also was a valid tender.

13. Judge Learned Hand dissented on other grounds.

Thus even in its own context the Aluminum Workers doctrine stands at best on doubtful footing.

Counsel have devoted much effort and thought to the applicability or inapplicability of the Aluminum Workers doctrine to an initiation fee situation because of claimed differences between such fees and dues in respect to incidents of union membership.[14] We have held that the Act authorized the formulation of a collective bargaining agreement requiring employees to take action to join the union within the grace period or be exposed to possible discharge for non-compliance with the agreement, notwithstanding the belated tender of initiation fees, and that the agreement in question so provided. Accordingly, it is unnecessary to consider the asserted distinctions between fees and dues and we do not pass on that question. Of course, we are not to be understood as holding that Aluminum Workers cannot be applied validly to a delinquent dues situation. That issue is, of course, not before us and we express no opinion on it. We hold simply that the Act precludes application of the Aluminum Workers case to the instant controversy.

The contention was advanced on oral argument that an alternative ground exists for granting enforcement to the Board's Order. It was urged that there is here present conduct on the part of both the Union and the Company which precludes them from asserting their respective rights under the collective bargaining agreement. It is pointed out that the Respondents are (1) a Company which was apparently in continual breach for over five months of its contractual duty to discharge errant employees who failed to join the Union and that the discharge was effected after the Company was made aware of Balthrope's payment of the initiation fee and possibly after it learned that the Union had accepted the tendered check, and (2) a Union which demanded the employee's discharge after he had paid his fees and which took no action apparently to forestall Balthrope's discharge after it had accepted his tender.

Careful attention and consideration has been given this argument. It is not without appeal or merit. But the conclusion seems inescapable that it cannot be supported on the record now before us.

The Board's majority opinion alludes to the fact that the Union accepted Balthrope's payment prior to his discharge, which evoked a charge from the dissenters that the majority was resting, in part, "upon some inarticulated waiver theory." The majority's reference to the acceptance of Balthrope's payment immediately follows an express holding that the Aluminum Workers doctrine controls the instant case. Although the question is not wholly free from doubt, it would appear that the majority mentioned the acceptance of payment merely as a fact adverse to Respondents to buttress the "tender before discharge" holding and not as an additional ground of decision. For, as the dissenting Board members and the Trial Examiner observed, the General Counsel raised no issue concerning waiver, acquiescence or similar conduct on the part of either Respondent.[15] Thus the preclusion argument addressed to this Court was not

---

14. Respondents contend there is a basic difference between initiation fees which enable an employee to become a union member and periodic dues which are required to be paid to maintain union membership. They assert that the duty to pay dues cannot arise until the employee has acquired union membership. Accordingly, the Union could not collect dues from Balthrope for the intervening four month period between the expiration of the grace period and the time of tender and therefore he was a "free rider" for this period. Petitioner argues, first, that the Union is not here prejudiced because it received the only sum it requested and, second, that the Union could obtain payment of the dues from either Balthrope or the Company. We express no opinion as to whether or not the Union could exact as consideration for relinquishing its right to press for the employee's discharge for late tender of initiation fees the payment of dues for the interim period between the end of the grace period and the date of tender.

15. See Dissenting Opinion (R. 74) and Intermediate Report (R. 40–41).

raised, argued or decided in the proceedings to date.

It must be borne in mind that we are here asked to evolve equitable principles and standards in a virgin area of labor law. Surely an employee must not remain perpetually vulnerable to discharge because of tardiness in submitting initiation fees, irrespective of the conduct engaged in by the union or the employer. Either the employer or the union may by its actions be estopped from asserting its particular rights under the collective bargaining agreement. But inherent in making such a determination is the balancing and accommodation of different interests and various factors based on policy considerations. The questions presented thereby are manifold. It would be necessary to ascertain what factors are relevant and the proportionate weight to be accorded each in the determination of whether a union is precluded to cause, or an employer to effect, the discharge of an employee based on failure to tender on time the uniformly required initiation fees under a valid union security agreement. Moreover, a conclusion predicated on equitable grounds denying Respondents the right to exercise their statute-approved contractual rights necessitates a complete and searching analysis of the particular factual situation. Here the skeleton character of the stipulation is in itself a formidable obstacle to any such a conclusion.[16]

We believe that under the circumstances here existing this issue should be considered in the first instance by the Board. Not only the uncertain state of the record dictates this conclusion. It also appears sound policy to permit the body charged with the primary responsibility for the enforcement of the Act to utilize its specialized competency and knowledge in the field of labor relations to develop the equitable principles required by the preclusion theory.

Apart from any preclusion theory, it may well be, too, that in fact Balthrope's discharge was caused for a reason or reasons other than the failure to tender his initiation fee on time—the only ground upon which his discharge could be sought lawfully. If this be true, it may also be that the Company had reason to know the true reason for the Union's reiterated demand for discharge. Certainly the record does not negate the possibility that other considerations motivated the Union's demand. And, of course, if any other reason or motive did play any part in causing Balthrope's discharge, the Union was guilty of an unfair labor practice, and if the Company had reason to know the Union's true motive, then it too committed an unfair labor practice. However, the Board made no finding on this issue. A finding that the discharge was caused for a reason or reasons other than the failure to tender initiation fees or periodic dues is essential if the Order is to be enforced. International Ass'n of Machinists, A.F.L.-C.I.O. v. N. L. R. B., supra.

In view of the disposition made of Respondents' first and main defense we need not consider other defenses submitted by them.

The petition of the Board is denied. The cause is remanded to the Board for such further proceedings as it deems justified in light of the views expressed in this opinion.

16. For example, the stipulation does not reveal whether the Company received notice of the Union's acceptance of Balthrope's tender prior to the time it discharged him nor whether the Union took any action, favorable or unfavorable, in respect to Balthrope's continued employment with the Company in the three day period between acceptance of his tender and discharge. We do not pass on the particular relevancy of these or other facts omitted in the stipulation. We set them out merely to illustrate the incomplete and uncertain depiction of the overall factual situation that is presented by the record before us.