**RAILROAD CONCRETE CROSSTIE CORPORATION, Petitioner,**

v.

**RAILROAD RETIREMENT BOARD, Respondent.**

No. 82–5672.

United States Court of Appeals, Eleventh Circuit.

July 18, 1983.

Neill & Mullenholz, John Mullenholz, Washington, D.C., for petitioner.

Dale G. Zimmerman, Gen. Counsel, Thomas W. Sadler, Bur. of Law, R.R.

Retirement Bd., Chicago, Ill., for respondent.

Before JOHNSON and ANDERSON, Circuit Judges, and COLEMAN *, Senior Circuit Judge.

JOHNSON, Circuit Judge:

Railroad Concrete Crosstie Corporation ["Railroad Concrete"] appeals from a determination made by the Railroad Retirement Board ["the Board"] that it is an employer under the Railroad Retirement Act of 1974, 45 U.S.C.A. § 231 et seq.[1], and the Railroad Unemployment Insurance Act, 45 U.S.C.A. § 351 et seq. ["RRA" and "RUIA" or "the Acts"]. On direct appeal to this Court under 45 U.S.C.A. §§ 231g and 355(f),[2] we affirm.

The General Counsel of the Board issued a determination, General Counsel opinion L79–76, that Railroad Concrete was an employer under the Acts. The determination applied retroactively to Railroad Concrete's date of incorporation, September 30, 1971. General Counsel reaffirmed its decision, General Counsel opinion L79–184, and an appeal to the Board followed. The Board summarily affirmed the General Counsel's decision, with one member dissenting.

I. The Relationship of Railroad Concrete and Florida East Coast Railway Company

The facts in this case were stipulated. Railroad Concrete is a wholly owned subsidiary of the Florida East Coast Railway Company ["Florida East Coast"]. Florida East Coast is a class I railroad engaged in the transportation of freight by rail. In 1964 Florida East Coast decided to install concrete ties on its tracks. It began purchasing the ties from American Concrete Crosstie Corporation ["American Concrete"]. Later, it also entered into a contract to purchase ties from Maule Industries. Eventually, American Concrete leased property from Florida East Coast and built a manufacturing plant on the leased property which was adjacent to Florida East Coast's mainline track south of Jacksonville, Florida.

On September 30, 1971, Florida East Coast formed Railroad Concrete. Railroad Concrete purchased American Concrete's plant and machinery at the Jacksonville site. Railroad Concrete leases the property upon which the plant is situated from Florida East Coast. Railroad Concrete hired some of the personnel who had been employed by American Concrete. The manager of Railroad Concrete's manufacturing plant is the only employee of Florida East Coast who was hired by Railroad Concrete. He was retained as a Florida East Coast employee in order to maintain his seniority with the railroad.

All equipment used by Railroad Concrete is owned by it except one three quarter ton pick-up truck. Equipment is maintained by outside contractors with the exception of trucks which are maintained by Florida East Coast Highway Dispatch Company, another subsidiary of Florida East Coast. The charges for maintenance are billed to Railroad Concrete. All materials used in the manufacturing process are paid for by Railroad Concrete. However, Railroad Concrete can use the Florida East Coast stores whenever necessary; it is billed for

---

* Honorable James P. Coleman, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. The Railroad Retirement Act of 1974 amended generally the Railroad Retirement Act of 1937. Pub.L. 93–445, 88 Stat. 1305. The Railroad Retirement Act of 1974 took effect on January 1, 1975. The events in this appeal occurred under both the 1937 and 1974 Acts. We do not separately analyze the Acts, however, because the definition of employer in the 1974 Act, 45 U.S.C.A. § 231(a)(1), at issue in this appeal, is substantially similar to the definition contained in the 1937 Act, 45 U.S.C.A. § 228a(a).

2. 45 U.S.C.A. § 231g incorporates by reference the review provisions of the RUIA, 45 U.S.C.A. § 355(f), which provides for direct review of any final decision of the Board by the Court of Appeals.

the items it purchases. In addition, Florida East Coast welds the steel frames used in Railroad Concrete's manufacturing process and sells them to Railroad Concrete. Both accounting and personnel records are maintained for Railroad Concrete by the Florida East Coast accounting department; Railroad Concrete pays for these services. Insurance claims are also handled for Railroad Concrete by a Florida East Coast clerk. Railroad Concrete's employees do not generally perform work for Florida East Coast but do perform activities on an occasional emergency basis.

Since its inception, Railroad Concrete has principally manufactured concrete crossties. It conducts all of its operations at the Jacksonville plant. Although Railroad Concrete sells some of its ties to third parties, approximately 90% of its output is sold to Florida East Coast. The price of the ties includes a profit for Railroad Concrete.

## II. Review of the Board's Decision

The standard of review in this circuit is that the Board must be affirmed "if its finding of fact is supported by substantial evidence and its decision is not based on an error of law." *Kurka v. United States Railroad Retirement Board,* 615 F.2d 246, 249–50 (5th Cir.1980). Railroad Concrete contends that a remand is necessary in this case because the Board failed to make specific findings in its opinion.[3] The Board summarily affirmed the General Counsel's decision, by holding that "Railroad Concrete Crosstie Corporation is an employer within the meaning of the two acts." The General Counsel's decision, in turn, relied on the statutory section in each Act defining "employer," the regulation interpreting a crucial phrase in the employer definition, and a case interpreting the employer definition under the Acts, *Southern Development*

*Company v. Railroad Retirement Board,* 243 F.2d 351 (8th Cir.1957). Although in our view a better practice is "that an agency sufficiently explain the basis for its decision and articulate the standards and rationale used...." *McHenry v. Bond,* 668 F.2d 1185, 1192 (11th Cir.1982), we conclude that a remand is unnecessary in this case because the facts were stipulated and the General Counsel stated the reasons for its ruling in its two opinions. One of the chief reasons for requiring reasoned explanations of agency decisions is to inform the aggrieved party of the reasons for the agency action to assist him in determining whether, and on what grounds, to seek judicial review. In this case the filing of the twenty-five page dissent by one member of the Board partially serves that function and further militates against a finding of prejudice to Railroad Concrete.

## III. The Plain Meaning of the Statute

In determining the meaning of a statute, a court looks first to its language. *Perrin v. United States,* 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). The definitions of "employer" under the RRA, 45 U.S.C.A. § 231(a)(1), and the RUIA, 45 U.S.C.A. § 351(a), are substantially similar. An employer is defined, in pertinent part, as:

(i) any express company, sleeping car company, and carrier by railroad, subject to part I of the Interstate Commerce Act [49 U.S.C.A. § 1 et seq.];

(ii) any company which is directly or indirectly owned or controlled by, or under common control with, one or more employers as defined in paragraph (i) of this subdivision, and which operates any equipment or facility or performs any service (except trucking service, casual

---

**3.** Railroad Concrete's allegation that the Board erred by failing to follow its own regulations is meritless. Under 20 C.F.R. § 258.6, the hearing officer appointed by the Board is required to submit a report setting forth findings of fact, conclusions of law, and a recommendation for a decision. Although a hearing officer was initially appointed for this case, Railroad Concrete waived a hearing. The appointed hearing

officer changed jobs, and it appears that a replacement was never named. Any error by the Board in not requiring the report is clearly harmless because the decision to appoint a hearing officer is not mandatory but is within the Board's discretion, the hearing officer's report is advisory only, and the facts were stipulated.

service, and the casual operation of equipment or facilities) in connection with the transportation of passengers or property by railroad, or the receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, or handling of property transported by railroad;

45 U.S.C.A. § 231(a)(1). Railroad Concrete is not a carrier by railroad and so is not an employer under 45 U.S.C.A. § 231(a)(1)(i). However, Railroad Concrete has conceded that it is controlled by Florida East Coast, a carrier, and therefore meets the first prerequisite of 45 U.S.C.A. § 231(a)(1)(ii). Railroad Concrete, nevertheless, contends that it is not an employer under the Acts because it does not "perform any service . . . in connection with the transportation of passengers or property by railroad." The phrase "service or operation in connection with railroad transportation" is defined in 20 C.F.R. § 202.7:

The service rendered or the operation of equipment or facilities by persons or companies owned or controlled by or under common control with a carrier is in connection with the transportation of passengers or property by railroad, or the receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, or handling of property transported by railroad, if such service or operation is *reasonably directly related, functionally or economically,* to the performance of obligations which a company or person or companies or persons have undertaken as a common carrier by railroad, or to the receipt, delivery, elevation, transfer in transit, refrigeration or icing, storage, or handling of property transported by railroad.

(Emphasis added.)

Railroad Concrete argues that the manufacture of crossties cannot be construed as a "service." Although Webster defines "service" as "useful labor that does not produce a tangible commodity," and a concrete crosstie is a tangible commodity, it is the *provision* of the crossties by Railroad Concrete to Florida East Coast which constitutes the "service." It is undisputed that the vast majority of Railroad Concrete's output is sold to Florida East Coast. The provision of a steady, dependable supply of an essential item is a service. Indeed, if the provision of crossties was not a much needed service, it is difficult to understand why Florida East Coast would have gone to the trouble and expense of acquiring a subsidiary to provide crossties and why Florida East Coast assists the operations of Railroad Concrete in numerous ways.

The conclusion that the provision of crossties by Railroad Concrete to Florida East Coast constitutes a "service . . . in connection with the transportation of passengers or property by railroad" is also premised on the essential nature of the product to the functioning of the railroad. The only other product that is as integral to the operation of a railroad is the rolling stock itself. Railroad Concrete's provision of concrete crossties is clearly related both "functionally [and] economically," 20 C.F.R. § 202.7, to Florida East Coast's obligations as a carrier. Although the decision of the Board could be affirmed simply by considering the language of the statute, we will also examine the statute's legislative history, court decisions, and General Counsel decisions, as urged by petitioner.

IV.  Legislative History

Railroad Concrete does not cite any legislative history surrounding the enactment of the Acts in support of its position. Instead, it contends that Congress' failure to pass certain amendments to the coverage provisions of the Acts in 1946 indicated its intent not to extend coverage to manufacturing subsidiaries of carriers. Pretermitting the question of whether a failure to enact legislation can demonstrate any intent at all, it is evident that the failure to pass section one of the amendments had nothing to do with the manufacturing language in that section. All of section one of the proposed amendment was passed by the House but defeated in the Senate. See 92 Cong.Rec. 10158 (1946) (passage of Senator Hoey's amendment striking section one). Railroad Concrete argues that section one was defeated because of apprehension over the

inclusion of manufacturing activities. However, an examination of the lengthy Senate debates on the amendments establishes that no member of the Senate expressed any concern about the manufacturing language in paragraph five of section one.[4] Indeed that paragraph was simply seen as "an effort to spell out in more detail the provisions of the present law . . . ." *Id.* at 1008 (statement of Sen. Barkley).

During the debates it was constantly reiterated that only two new categories were being added to coverage: railroad owned or controlled trucking companies, and freight forwarders. *E.g., id.* at 9993, 1008. Nevertheless, many Senators voiced fears about the coverage provisions of the proposed section one. Their speeches were confined to expressing apprehension that the amendments would expand coverage to include nonsubsidiaries of carriers, such as independent ice companies, warehouse companies, and trucking companies. *E.g., id.* at 9997–9999; *See also* S.Rep. No. 1710 part 2, 79th Cong. 2d Sess. 5–6 (1946), U.S.Code Cong. Serv. 1946, p. 1316. Most indicative of those fears is the concurrent resolution that was offered to alleviate concerns about coverage. In the concurrent resolution:

> all ice companies, all refrigeration companies, and all refrigeration activities not owned by a railroad company itself, would be excluded. All warehouse activities not owned by a railroad company itself would be excluded. All trucking, all hauling by motor vehicles not owned or controlled by carriers, would be excluded.

92 Cong.Rec. at 10011. The concurrent resolution was not passed because of reservations about circumventing proper parliamentary procedure. *E.g., id.* at 10122. Instead, the Senate eliminated the entire section one of H.R. 1362 by amendment, *id.* at 10158, before passing the bill amending the Acts. *Id.* at 10172.

## V. Case Law

This case presents a question of first impression, for no other cases have considered whether an affiliate that is engaged solely in the manufacture of materials necessary for the operation of the railroad is included within the Acts. Case law is useful, however, both in identifying the purpose of the Acts and in illustrating how "service . . . in connection with transportation" has been applied in factual situations similar to the one at hand.

The RRA was enacted to provide "a system of annuity, pension, and death benefits for employees of designated classes of employers"; the RUIA was enacted to provide unemployment insurance for those employees. *Railroad Retirement Board v. Duquesne Warehouse Company,* 326 U.S. 446, 447–48, 66 S.Ct. 238, 239, 90 L.Ed. 192 (1946). Subsidiaries and affiliates of railroads were included in the Acts in order to prevent the situation described in *Despatch Shops v. Railroad Retirement Board,* 153 F.2d 644, 646 (D.C.Cir.1946):

> [I]t can be readily seen that the railroads would be free to take from under the Act [the RUIA] virtually all of their workers whose employment is in the "supporting" activities, through the simple expedient of setting up wholly owned corporate affiliates to perform these services. It is conceivable that everything from maintenance-of-way through engineering or bookkeeping might be done by so called "independent" corporations. The application of this Act and of the other Acts passed for similar purposes and embodying the same language could be so severely limited as to render them of little worth in achieving the purposes for which they were passed.

In *Southern Development Company v. Railroad Retirement Board,* 243 F.2d 351

---

4. The section of the proposed amendment dealing with manufacturing stated that a subsidiary was included if it was:

> engaged in performing services necessary or incidental to the conduct of transportation carried on by such carrier or services in the manufacture of equipment or equipment parts or in the processing of materials for use in the operation, servicing, or maintenance of way, structures or equipment devoted to use in transportation . . . .

H.R. 1362, 79th Cong., 2d Sess. § 1(5)(ii) 1946.

(8th Cir.1957), the case relied on in the General Counsel's opinions, the Eighth Circuit held that Southern, a subsidiary of the Kansas City Southern Railway Company, was an employer within the meaning of the Acts. Southern owned various pieces of property, one of which was the building that was occupied by Kansas City Southern Railway Company's general offices and where its city ticket office was located. Southern had 17 employees, all of whom were engaged in the cleaning and maintenance of this office building. The court stated that "[t]he statutory language 'services in connection with transportation ... by railroad' is not restrictive to transportation alone but includes activities in support of such transportation." *Id.* at 354. In deciding whether Southern's activities fell within the statutory language, the court noted:

> Maintaining a building almost exclusively for use by a railroad company for ticket selling and general offices could reasonably be considered a service connected with and supportive of rail transportation. A railroad could not operate, at least not efficiently, without ticket offices and without general offices ... the furnishing of the office space and its maintenance, care and repair are certainly supportive of transportation and essential to its proper functioning.

*Id.* at 355. Similarly, the furnishing of crossties by Railroad Concrete to Florida East Coast is "supportive of transportation and essential to its proper functioning."

The case factually most similar to the one at hand is *Despatch Shops v. Railroad Retirement Board,* 153 F.2d 644, 646 (D.C. Cir.1946).[5] Despatch was a subsidiary of New York Central Railroad Company ["Central"]. It performed various types of freight car repairs, including "heavy" repairs such as rebuilding cars. It also manufactured new cars. Its plant was located alongside the Central main line, and approximately 98% of the work performed by Despatch was for Central and its subsidiaries. Faced with these facts, the court stated: "The only reasonable conclusion that can be drawn ... is that the primary function of Despatch has been to serve Central and its subsidiaries." *Id.* at 645. It further commented: "It is difficult to conceive of any supporting activity that is more inherent or vital to the sustained functioning of a railroad system than the repair and construction of its rolling stock." *Id.* at 646. The facts of this case are similar to *Despatch* in that it is evident that the primary function of Railroad Concrete is to serve its parent, Florida East Coast, and that the provision of crossties is as essential to the functioning of the railroad as are the repair and manufacture of cars. Nevertheless, Railroad Concrete argues that it is not an employer under the Acts because it is simply performing the same manufacturing activity that was previously performed by American Crosstie, whose employees were not covered by the Acts. The court in *Despatch* dismissed a similar contention:

> It is no answer, as petitioner suggests, that it could close its back shops and turn over the repair work to independent contractors. Whether the railroad should do its repair work in its own shops, or in those of another, is a question of railroad management. It is petitioner's determination to make its own repairs which has brought its relations with shop employees within the purview of the Railway Labor Act.

*Id.* (quoting *Virginia Railroad Co. v. System Federation,* 300 U.S. 515, 557, 57 S.Ct. 592, 604, 81 L.Ed. 789 (1937)).

## VI. General Counsel Opinions

Railroad Concrete contends that the decision of the Board contradicts five earlier General Counsel opinions[6] which held that subsidiaries or affiliates of railroads that engaged in manufacture and sales of railroad equipment were not employers under

---

5. The same facts were presented and the same result reached in *Despatch Shops v. Railroad Retirement Board,* 154 F.2d 417 (2nd Cir.1946).

6. These five opinions were letter opinions by the General Counsel and were not appealed to the full three-member Board.

the Acts. However, a close examination of those decisions reveals that the subsidiaries and affiliates in those cases were not performing a service of the same character as Railroad Concrete because their product was not sold primarily to the controlling carrier.

In *Youngstown Sheet and Tube Company,* General Counsel opinion L40–391, the company sold "between 3 and 3½ percent of the net tonnage" of its sales to railroad carriers. The holding in *Ford Motor Company,* General Counsel opinion L40–304, identifies the difference between that case and the instant one. The company was held not to be an employer because:

> the sales of its products to railroads have been made in the regular course of business, but these transactions obviously not constituting any major portion of the Company's distributing activities, have been purely commercial sales rather than *services in the procurement of products required by railroads.*

(Emphasis added.) In *Wheeling Steel Corporation,* General Counsel opinion L39–571, a steel company controlled a carrier. However, it was held not to be an employer under the RRA because it sold steel products to various railroads on a "purely commercial basis" and there was no finding that a substantial portion of the company's sales was made to the carrier it controlled. The facts in *Wheeling* are similar to those in *Carnegie-Illinois Steel Corporation,* General Counsel opinion L39–811. Carnegie-Illinois manufactured iron and steel products and their by-products. Sales were made to "many railroads throughout the country, 'on a straight sale basis,' " and the company also sold its steel products to other industrial companies. The General Counsel's decision stated that "there was nothing to indicate that, so far as a service relationship was concerned, any carrier by railroad was in any position different from that of any other industrial customer of the Steel Corporation." These cases differ from the one we now consider because Railroad Concrete sold approximately 90% of its products to Florida East Coast, thus creating a service relationship. Furthermore, the nature and variety of the manufactured products in the four cases discussed above made it less likely that the provision of the product could be considered a service.

*Pullman Standard Car Manufacturing Company,* General Counsel opinion L40–403, is closer to this case since the primary product manufactured by the company, railroad cars, is certainly essential to the operation of a railroad. However, although Pullman-Standard and its predecessors had sold cars and other products to its affiliated company, the Pullman Company, the General Counsel found that "most of their business has been with unaffiliated railroad and non-railroad companies." That factor is in marked contrast to the case at hand, where not only "most," but 90%, of the subsidiary's sales are to the parent company.

Our opinion does not purport to hold that in all cases subsidiaries or affiliates that are directly or indirectly owned or controlled by a carrier and that manufacture products that are sold to the carrier will be held to be an employer under the Acts. Nor do we attempt to set any guidelines for determining when the amount of sales are substantial enough and the type of product so inextricably linked to the operation of the railroad that the sale of the product constitutes a "service . . . in connection with the transportation of passengers or property by railroad . . . ." We simply decide that in a case such as this, when the nature of the relationship and the volume of sales between Railroad Concrete and Florida East Coast indicate that the subsidiary is economically dependent on the parent, and when the type of product is so obviously essential to the functioning of the railroad, that the subsidiary's provision of the product constitutes a service to the parent within the meaning of 45 U.S.C.A. §§ 231(a)(1) and 351(a).

The determination of the Railroad Retirement Board that Railroad Concrete Crosstie Corporation is an employer under the Railroad Retirement Act, 45 U.S.C.A. § 231 et seq., and the Railroad Unemployment In-

surance Act, 45 U.S.C.A. § 351 et seq., is AFFIRMED.