R.J. CORMAN RAILROAD COMPANY/MEMPHIS LINE; R.J. Corman Railroad Corporation, Plaintiffs–Appellants,

v.

Carol M. PALMORE, in her capacity as Secretary of Labor of the Commonwealth of Kentucky; Commonwealth of Kentucky Labor Cabinet, Defendants–Appellees.

No. 92–5552.

United States Court of Appeals, Sixth Circuit.

Argued March 16, 1993.

Decided July 16, 1993.

---

David R. Irvin (argued & briefed), Susan S. Durant, Moynahan, Bulleit, Kinkead & Irvin, Lexington, KY, for plaintiffs-appellants.

Kembra Sexton Taylor (argued & briefed), Office of Gen. Counsel, Kentucky Labor Cabinet, Frankfort, KY, for defendants-appellees.

Before: KENNEDY and SUHRHEINRICH, Circuit Judges; and SPIEGEL, District Judge.*

SUHRHEINRICH, Circuit Judge.

Plaintiffs R.J. Corman Railroad Company/Memphis Line and R.J. Corman Railroad Company challenge the district court's holding that Ky.Rev.Stat. § 337.285 is not preempted by federal legislation governing railroads. For the following reasons, we **REVERSE.**

## I.

Plaintiffs, two sister corporations, engage in interstate rail transportation of freight between Kentucky and Tennessee, as well as transportation of goods within Kentucky in connection with CSX Transportation, an interstate railroad. There is no collective bargaining agreement between plaintiffs and their employees.

In 1989, the Kentucky Labor Cabinet ("Cabinet") received complaints from plaintiffs' employees that plaintiffs were not paying wages of time and a half for hours worked beyond forty hours per week, as required by Ky.Rev.Stat. § 337.285.[1] In response to these complaints, the Cabinet commenced state administrative proceedings, seeking approximately $40,000 in unpaid overtime wages.

---

* The Honorable S. Arthur Spiegel, United States District Judge for the Southern District of Ohio, sitting by designation.

1. Section 337.285 provides, in pertinent part: No employer shall employ any of his employes for a work week longer than forty (40) hours, unless such employe receives compensation for his employment in excess of forty (40) hours in a work week at a rate of not less than one and one-half (1½) times the hourly wage rate at which he is employed. . . .

Plaintiffs brought suit in district court against Carol Palmore, the Kentucky Secretary of Labor, and the Cabinet, arguing that the Kentucky statute is preempted as to interstate railroads by the comprehensive federal legislation governing interstate railroads. On cross-motions for summary judgment, the district court found that the Kentucky statute was not preempted.

## II.

### A.

The United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land...." U.S. Const. art. VI, cl. 2. Thus, "[w]here a state statute conflicts with or frustrates federal law, the former must give way." *CSX Transp., Inc. v. Easterwood,* —— U.S. ——, ——, 113 S.Ct. 1732, 1737, 123 L.Ed.2d 387 (1993). In deciding whether federal law preempts a state law, the intent of Congress is paramount. *Id.; Cipollone v. Liggett Group, Inc.;* —— U.S. ——, ——, 112 S.Ct. 2608, 2617, 120 L.Ed.2d 407 (1992). Where a federal statute contains no express statement regarding preemption, the intent to preempt state law may be inferred if an actual conflict exists between the federal and state law or "if federal law so thoroughly occupies a legislative field 'as to make reasonable the inference that Congress left no room for the States to supplement it." ' " *Cipollone,* —— U.S. at ——, 112 S.Ct. at 2617 (quoting *Fidelity Fed. Sav. & Loan Ass'n v. De la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982) (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947))). *Accord Gade v. National Solid Wastes Mgmt. Ass'n,* —— U.S. ——, ——, 112 S.Ct. 2374, 2383, 120 L.Ed.2d 73 (1992). Here, plaintiffs contend that the intent of Congress to preempt state overtime regulation of interstate railroads is shown by the comprehensive scheme of federal law governing interstate railroads.[2]

Viewed as "a state within a state," *California v. Taylor,* 353 U.S. 553, 565, 77 S.Ct. 1037, 1044, 1 L.Ed.2d 1034 (1957) (citation omitted), the railroad industry has been "subject to comprehensive federal regulation for nearly a century." *United Transp. Union v. Long Island R.R. Co.,* 455 U.S. 678, 687, 102 S.Ct. 1349, 1355, 71 L.Ed.2d 547 (1982). Indeed, "[p]erhaps no industry has a longer history of pervasive federal regulation than the railroad industry." *Consolidated Rail Corp. v. Metro–North Commuter R.R.,* 638 F.Supp. 350, 357 (Regional Rail Reorg. Ct.1986).

The earliest federal legislation regarding interstate railroads is the Pacific Railroad Act of 1862, ch. 120, 12 Stat. 489, which granted rights of way through public lands so that a transcontinental rail system could be established. *See United Transp.,* 455 U.S. at 687 n. 13, 102 S.Ct. at 1355 n. 13; *Ames v. Kansas ex rel. Johnston,* 111 U.S. 449, 450, 4 S.Ct. 437, 437, 28 L.Ed. 482 (1884). In 1887, Congress enacted the Interstate Commerce Act of Feb. 4, 1887, 24 Stat. 379, which established the Interstate Commerce Commission (ICC) to comprehensively regulate rail shipping in interstate commerce. *See United States v. Pennsylvania R.,* 323 U.S. 612, 618–19, 618 n. 5, 65 S.Ct. 471, 474–75, 474 n. 5, 89 L.Ed. 499 (1945). Congress then enacted the Arbitration Act of 1888 as a means of smoothing railroad labor relations in order to avoid strikes which would seriously disrupt the stream of interstate commerce by rail. *See International Ass'n of Machinists v. Street,* 367 U.S. 740, 756 n. 11, 81 S.Ct. 1784, 1793 n. 11, 6 L.Ed.2d 1141 (1961) (discussing history of federal railroad labor regulations).

In the twentieth century, Congress continued to exercise its power in the area of railroad labor matters. In 1907, Congress enacted the Hours of Service Act (HSA), 45 U.S.C. §§ 61–64b to promote safety by limiting the hours various types of railroad employees could work consecutively. *See Chicago & Alton R.R. v. United States,* 247 U.S. 197, 199, 38 S.Ct. 442, 443, 62 L.Ed. 1066

---

**2.** Plaintiffs also contend that the matter of overtime wages is a minor dispute subject to arbitration under the Railway Labor Act, 45 U.S.C. § 153 First (i). Because we hold that the state statute is preempted, we need not address this argument.

(1918); *Atchison, Topeko & Santa Fe Ry. v. United States*, 244 U.S. 336, 342–43, 37 S.Ct. 635, 637, 61 L.Ed. 1175 (1917). In 1916, Congress enacted the Adamson Act, 45 U.S.C. §§ 65–66, in response to threatened strikes by the railroad unions due to the railroads' refusal to adopt an eight-hour day or pay time and a half for overtime. *See Wilson v. New*, 243 U.S. 332, 340–45, 37 S.Ct. 298, 298–300, 61 L.Ed. 755 (1917); *Burke v. Monumental Division, No. 52, Brotherhood of Locomotive Engineers*, 273 F. 707, 709 (D.Md.1919). The Adamson Act mandates that eight hours constitute the standard workday of railroad employees, but leaves "employers and employees free as to the subject of wages to govern their relations by their own agreements...." *Wilson*, 243 U.S. at 345–46, 37 S.Ct. at 300–01.[3] In 1926, Congress enacted the Railway Labor Act (RLA), 45 U.S.C. §§ 151–188, which imposes a duty on rail carriers and their employees to reach "agreements concerning rates of pay, rules, and working conditions," RLA, 45 U.S.C. § 152 First, and creates mandatory grievance resolution procedures. RLA, 45 U.S.C. §§ 155, 157. *See Street*, 367 U.S. at 757, 81 S.Ct. at 1794.

Congress has regulated numerous other aspects of the railroad industry. As early as 1893, Congress began enacting a series of acts known collectively as the Safety Appliance and Boiler Inspection Acts, 45 U.S.C. §§ 1–43a which requires safety equipment for railroad equipment used in interstate commerce. More recently, Congress enacted the Federal Railroad Safety Act of 1970 (FRSA), 45 U.S.C. §§ 421–447 to reduce rail-related accidents by authorizing the promulgation of federal railroad safety regulations. *See* FRSA, 45 U.S.C. §§ 421, 431; *Missouri Pac. R.R. v. Railroad Comm'n*, 850 F.2d 264, 266 (5th Cir.1988), *cert. denied*, 488 U.S. 1009, 109 S.Ct. 794, 102 L.Ed.2d 785 (1989); *Chicago Transit Authority v. Flohr*, 570 F.2d 1305, 1308 (7th Cir.1977); *Donelon v. New Orleans Terminal Co.*, 474 F.2d 1108, 1112

(5th Cir.), *cert. denied*, 414 U.S. 855, 94 S.Ct. 157, 38 L.Ed.2d 105 (1973).

Congress has also provided railroad employees with specialized provisions for retirement and unemployment. The Railroad Retirement Act of 1974 (RRA), 45 U.S.C. §§ 231–231u provides unique annuity, pension, and death benefits for railroad employees. *Railroad Concrete Crosstie Corp. v. Railroad Retirement Bd.*, 709 F.2d 1404, 1409 (11th Cir.1983); *Capovilla v. Railroad Retirement Bd.*, 924 F.2d 885, 888 (9th Cir. 1991). The Railroad Unemployment Insurance Act (RUIA), 45 U.S.C. §§ 351–368 provides unemployment compensation to railroad employees. *Railroad Crosstie*, 709 F.2d at 1409; *McKissick v. Railroad Retirement Bd.*, 295 F.2d 287, 288 (7th Cir.1961).

In perhaps the most striking example of its concern with interstate rail operations, Congress enacted the Regional Rail Reorganization Act of 1973, 45 U.S.C. §§ 701–797m, which responded to the bankruptcy of eight northeastern and midwestern railroads by combining them into the Consolidated Rail Corporation (Conrail), a private, for-profit corporation. *See Regional Rail Reorganization Act Cases*, 419 U.S. 102, 108–17, 95 S.Ct. 335, 341–45, 42 L.Ed.2d 320 (1974). Acting on its interest in safeguarding interstate rail commerce, Congress exercised its plenary power over commerce to reorganize the entire eastern and midwestern railroad industry in order to guarantee their effective and continued operation. *Id.* at 108–09, 95 S.Ct. at 341–42.

Without doubt, Congress has undertaken the regulation of almost all aspects of the railroad industry, including rates, safety, labor relations, and worker conditions. This lasting history of pervasive and uniquely-tailored congressional action indicates Congress's general intent that railroads should be regulated primarily on a national level through an integrated network of federal law. We now turn to the Kentucky overtime statute challenged here.

---

**3.** At the time of its enactment, the Adamson Act included a temporary provision preventing railroads from lowering their employees' wages due to the establishment of the eight-hour day. Adamson Act, ch. 436, § 3, 39 Stat. 721. Upon expiration of this provision, employees and employers had to make their own agreements regarding wages and overtime. *See Wilson*, 243 U.S. at 345–46, 37 S.Ct. at 300–01.

**B.**

■ The Supreme Court has held that state law regulating the hours and overtime of railroad employees is preempted by federal law. In *Erie R.R. v. New York*, 233 U.S. 671, 34 S.Ct. 756, 58 L.Ed. 1149 (1914), a New York statute provided that certain railroad telegraph and telephone operators and signalmen could not work more than eight hours consecutively, except in emergencies, and required payment of time and one-eighth for hours worked beyond eight per day. *Id.* at 675 n. 1, 34 S.Ct. at 756 n. 1. At that time, § 2 of the HSA provided that railroad telegraph or telephone operators could work a maximum of nine consecutive hours of work per day. *Id.* at 678 n. 2, 34 S.Ct. at 756 n. 2.[4] The Court concluded that Congress had exclusively occupied the field of regulation by enacting the HSA, and stated:

> [T]he [HSA] ... is the judgment of Congress of the extent of the restriction necessary. It admits of no supplement; it is the prescribed measure of what is necessary and sufficient for the public safety and of the cost and burden which the railroad must endure to secure it.

*Id.* at 683, 34 S.Ct. at 760. Thus, congressional regulation in the area of worker hours has broad preemptive effect.

This preemptive force is now embodied in the Adamson Act, 45 U.S.C. § 65. The Act applies to all railroad employees and states:

> Eight hours shall, in contracts for labor and service, be deemed a day's work and the measure or standard of a day's work for the purpose of reckoning the compensation for services of all employees who are now or may here-after be employed by any common carrier by railroad....

The Adamson Act, 45 U.S.C. § 65. The Act pronounces Congress's desired standard workday for railroad employees, even more broadly than the HSA did.

Kentucky maintains, however, that no federal law expressly addresses overtime either by providing for or forbidding it, and that this lack of explicit regulation means that there is no conflict requiring preemption of state overtime regulations. We disagree. Although we recognize that preemption analysis is made more difficult by the lack of a plain congressional command or conspicuous conflict, it is not made impossible. Congress's intent to preempt may be inferred from the regulatory scheme itself. *See Cipollone*, —— U.S. at ——, 112 S.Ct. at 2617; *Gade*, —— U.S. at ——, 112 S.Ct. at 2383. Here, Kentucky has ignored Congress's aim in enacting the Adamson Act, which was to provide a uniform workday for railroad employees, yet leave the amount of compensation to labor agreements. *See Wilson*, 243 U.S. at 345–46, 37 S.Ct. at 300–01 (The Adamson Act leaves "employers and employees free as to the subject of wages to govern their relations by their own agreements...."); *Plummer v. Pennsylvania R.R.*, 37 F.2d 874, 875 (7th Cir.1929) ("The Adamson Act leaves the amount of wages to be paid for the standard day and overtime to the agreement of the employer and employee."). *See also Fort Smith & Western R.R. v. Mills*, 253 U.S. 206, 207–09, 40 S.Ct. 526, 526–27, 64 L.Ed. 862 (1920) (Adamson Act makes labor agreements as to wages controlling, even if the wages are less than that required by the Act's temporary wage provision). Kentucky's statute interferes with this congressional design.

In addition, Kentucky has encroached on a legislative area viewed by Congress as most appropriately governed by uniform federal regulation. As stated by the Supreme Court:

> [T]he Federal Government has determined that a uniform regulatory scheme is necessary to the operation of the national rail system. In particular, Congress long ago concluded that federal regulation of railroad labor relations is necessary to prevent disruptions in vital rail service essential to the national economy. A disruption of service on any portion of the interstate railroad system can cause serious problems throughout the system....
>
> ... To allow individual states ... to circumvent ... any of the ... elements of federal regulation of railroads, would de-

---

4. Presently, HSA, § 2, 45 U.S.C. § 62 regulates the on-duty and off-duty hours for certain railroad employees, as well as other employment conditions.

stroy the uniformity thought essential by Congress and would endanger the efficient operation of the interstate rail system.

*United Transportation,* 455 U.S. at 688–89, 102 S.Ct. at 1355–56. Thus, Kentucky has also interfered with the uniformity essential to efficient interstate rail operations. Although no federal statute expressly preempts state regulation of overtime for railroad employees, we hold that the congressional purpose behind the Adamson Act and Congress's longstanding decision to regulate railroads on a national level make it reasonable to infer that Congress has impliedly preempted the area of overtime regulation for railroad employees.

Kentucky responds that by finding its overtime law preempted, we leave plaintiff's employees without any overtime wage protection either in the form of the state statute or a collective bargaining agreement. We do not dispute the truth of this observation, but we do not agree that the employees are left entirely without recourse. Plaintiffs' employees, like all railroad employees, may bargain collectively under the RLA to resolve disagreements in the labor relationship. *See* RLA, 45 U.S.C. § 152 First (imposing duty on employers and employees "to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules and working conditions"); *Chicago & North Western Ry. v. United Transp. Union,* 402 U.S. 570, 574–81, 91 S.Ct. 1731, 1733–37, 29 L.Ed.2d 187 (1971) (holding that § 152 First imposes a judicially enforceable duty on railroad employers and employees to bargain collectively pursuant to the procedures of the RLA). *See also* 9 Theodore Kheel, *Labor Law* §§ 50.04[2][b], 50.05[1]–.05[2] (1992) (discussing collective bargaining process under the RLA). Indeed, as noted in *Wilson,* wages are supposed to be dealt with by agreement. We conclude that this is the sole avenue left available by Congress.

### III.

For the foregoing reasons, we find that federal law preempts Ky.Rev.Stat. § 337.285

as to interstate railroads. Therefore, we **REVERSE.**